[No. S004455, Crim. No. 22692. June 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL PINA BABBITT, Defendant and Appellant.

[Crim. No. 24440. June 16, 1988.]

In re MANUEL PINA BABBITT, on Habeas Corpus.

662

670

674

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Musawwir Spiegel, Deputy State Public Defender, and Louis N. Hiken for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ward A. Campbell, Garrett Beaumont and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant Manuel Pina Babbitt was convicted of the first degree murder (Pen. Code, § 187),[1] robbery (§ 211) and attempted rape (§§ 664, 261, subds. (2), (3)) of Leah Schendel and the burglary of Ms. Schendel's apartment (§ 459), and of the robbery (§ 211) and attempted rape (§§ 664, 261, subds. (2), (3)) of Mavis W. The jury found the murder to have occurred in the course of burglary (§ 190.2, subd. (a)(17)(vii)), robbery (§ 190.2, subd. (a)(17)(i)) and rape (§ 190.2, subd. (a)(17)(iii)), found defendant sane, and in the Schendel case imposed the sentence of death. This appeal is automatic. (§ 1239, subd. (b).) We have consolidated defendant's petition for writ of habeas corpus with the appeal.

As will appear, we affirm the judgment and deny the petition for writ of habeas corpus.

## I. FACTS

Defendant did not dispute that he committed the charged offenses, but in both the Schendel and the W. cases he asserted the defenses of diminished capacity and unconsciousness.

### A. *The Schendel Case.*

Leah Schendel lived in the Sacramento Manor, a senior citizen's complex located on North Manor Drive in Sacramento. On the evening of December 18, 1980, she dined out with relatives and returned to her apartment about 11 p.m. That same evening, Vernon McMaster, her next door neighbor, went to bed at his usual time between 10:30 and 11 p.m. He awoke sometime between 2 and 4 a.m. While lying in bed he heard a noise like a "thud or a thump" in Ms. Schendel's apartment. After that he did not hear anything. He then heard the television go on. McMaster lay awake in response to the noises for about an hour.

The next morning, December 19, Edna Smith, Leah Schendel's neighbor on the other side, checked on Ms. Schendel at McMaster's urging. The screen door to Ms. Schendel's apartment had been cut or broken and the main door was open. The television was on, but the sound was turned down. Receiving no response when she called Ms. Schendel's name, Ms. Smith called John Balvin, the resident manager of the complex. Ms. Smith had been up until 2 a.m. the previous night and had heard nothing except Ms. Schendel arriving home from dinner about 11 p.m.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

When Balvin entered Ms. Schendel's apartment, he found the furniture in disarray. Ms. Schendel's body was on the bedroom floor, covered from the waist up with a mattress or box springs. After determining that Ms. Schendel was dead, Balvin called the police.

The police arrived and secured the apartment. The apartment screen door had been ripped near the latch, apparently by a sharp instrument rather than a hand or finger. The apartment appeared to have been ransacked. The television set was turned on to channel 40, but there was no sound. Playing cards, broken dentures, and some pieces of glass were on the living room floor. A purse was on the floor. A knife was beside the television set. There was blood on the living room and kitchen floors, on the inside portion of the screen door, and on the doorway of the bedroom. Drawers and other items were scattered all over the bedroom.

When the mattress was removed from Ms. Schendel's body, it was noted that she was nude from the waist down. Her nightgown and pajama top were pulled above her breast area. A tea kettle was sitting on top of her pubic area, a leather strap was tied to her left ankle, an electrical cord lay across the lower part of her legs. A pillow by her head was heavily soaked with blood.

According to the pathologist, Leah Schendel died from a heart attack brought on by a severe beating and possible suffocation. She also showed signs of possible rape. Her body had suffered numerous lacerations and abrasions. Had Ms. Schendel not suffered from coronary disease, and had she not experienced physical and psychological stress caused by fright, the struggle, and pain from her wounds, the physical blows she received would not of themselves have proved fatal.

Defendant's fingerprints and palmprints were found on the handle of the tea kettle and on other items strewn about the apartment. Articles missing from the apartment were subsequently found among defendant's belongings.

B. *The Mavis W. Assault.*

About 10:30 or 11 p.m. on December 19, 1980, Mavis W. was returning to her home on 63d Avenue in Sacramento in her new Volkswagen Dasher automobile. As she approached her driveway she noticed defendant walking slowly by her house. When she turned into her driveway, defendant stopped, turned around, and looked at her.

As Mrs. W. alighted from her car, defendant grabbed her from behind. He demanded her car, but Mrs. W. threw the keys up the driveway.

Defendant dragged Mrs. W. behind some bushes and struck her until she lost consciousness. When she regained consciousness, she was lying on her back and defendant was attempting to pull off her pants. Mrs. W. again lost consciousness.

Julie W., Mavis W.'s daughter, was visiting her mother's house the evening of December 19th, as was George Iwamura. When George left the house to go home he saw defendant running across the neighbors' lawn. He also saw Mrs. W. lying on the lawn near the neighbors' house. George ran back to Mrs. W.'s house, told Julie, and called the police.

Julie found her mother lying unconscious on the grass, blood on her face and her clothing. Mrs. W. was nude from the waist down. Her purse was on the ground, its contents strewn about the yard. Taken from Mrs. W. were a silver pendant, money, a silver ring, and a gold watch with a gold band.

C. *The Defense.*

Defendant did not testify. Sacramento Police Detective Terry Brown testified that in a tape-recorded interview after his arrest, defendant denied any memory of the Schendel attack.

In a videotaped interview with defense psychiatrist Dr. David Axelrad, defendant related that he spent most of Thursday, December 18, 1980, the day preceding the early morning Schendel attack, with a woman whom he had met that morning. The pair spent most of the day at the Stix Bar, where they consumed some liquor and beer and smoked marijuana. That evening about 9 p.m. the woman left in a taxi. Defendant smoked more marijuana with some men who had parked nearby in a van. He then walked to 21st Street where he sat down on the ground and passed out. When he came to, there was a cigar box next to him with "stuff" in it. He denied any memory of the attack on Ms. Schendel.

Gerald Kato testified that on December 19, the day of the Mrs. W. attack, he met defendant at the Stix Bar. The two went out to Kato's truck about 9 or 10 p.m. and smoked marijuana. Kato stated that defendant appeared to act and talk normally.

Defendant's psychiatric defense of diminished capacity and unconsciousness was presented primarily through the testimony of his brother William and other family members, his common law wife Theresa, and Dr. Joan Blunt, a clinical psychologist.

The defense advanced three theories: (1) That as the result of childhood brain damage caused by a bicycle accident and a service-related injury

received in Vietnam, defendant's ability to think and function under stress was impaired; (2) that as a result of his combat service in Vietnam defendant manifested symptoms associated with post-traumatic stress disorder (PTSD); and (3) that defendant possibly suffered from psychomotor epilepsy, which condition would have rendered him unconscious of acts committed during a seizure.

## D. *Rebuttal.*

In rebuttal, the prosecutor put on psychiatrist Dr. Lee Coleman. Dr. Coleman's testimony is discussed in detail below in connection with defendant's claim of prosecutorial misconduct. In essence, Dr. Coleman testified that psychiatrists and psychologists are no better equipped than lay persons to infer what a defendant's mental state was at the time of an alleged offense.

## II. GUILT AND SANITY PHASES

As error during the guilt and sanity phases, defendant assigns the exclusion for cause of potential jurors opposed to the death penalty, the exclusion of certain evidence concerning his mental state at the time of the crimes, the court's instruction on the "presumption of consciousness" (CALJIC No. 4.31), prosecutorial misconduct, and ineffective assistance of counsel.

### A. *Denial of Representative and Impartial Jury.*

Defendant contends that the exclusion of some potential jurors for cause in accord with *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (exclusion of jurors unalterably opposed to the death penalty) denied him a jury representative of a fair cross-section of the community and denied him an impartial jury on the issue of guilt.

We rejected the first contention in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.), 374 (conc. opn. of Kaus, J.), and the second in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68 [168 Cal.Rptr. 128, 616 P.2d 1301], and *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]. The United States Supreme Court recently rejected the identical contentions in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].

### B. *Evidentiary Error.*

Defendant contends that through a combination of erroneous rulings excluding evidence concerning his mental state at the time of the crimes, the trial court prevented him from effectively presenting his defense.

The excluded evidentiary items are: (1) Testimony concerning the content of movies shown on channel 40 the night of Leah Schendel's murder; (2) combat records of defendant's Vietnam Marine company; (3) hospital records concerning defendant's head injuries suffered in a childhood bicycle accident; and (4) testimony concerning defendant's negative response to stimuli that reminded him of Vietnam.

### 1. *Channel 40 Movies.*

#### a. *Guilt Phase.*

One of the mental disorders defendant sought to prove in support of his defenses of diminished capacity and insanity was "PTSD."[2]

Psychologist Dr. Joan Blunt testified that, based on her psychological testing of defendant, her review of Tobey Hospital records of a head injury he received from a bicycle accident at age 12, and his behavioral history, she believed that defendant has both functional and organic brain damage. As a result of brain damage, defendant would have decreased stress tolerance, making it difficult for him to function in an environment that did not take his impairment into account. With this personality, defendant was at a higher than usual risk of developing pathology as a result of exposure to severe combat in Vietnam.

While in Vietnam, Dr. Blunt related, defendant sustained additional head trauma. In order to cope with the stress, he began taking more drugs and alcohol, which compounded his stress. On his return from Vietnam,

---

[2] Citing the American Psychiatric Association's Diagnostic and Statistical Manual III (DSM-III), which attempts to catalogue mental diseases and disorders and standardize terms relating thereto, defendant states that PTSD is described as a set of "characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience," and that military combat is recognized to be such a traumatic event.

"Among the DSM-III's comments on this condition, particularly relevant to [defendant's] situation," defendant states, "are the following: " 'The disorder is apparently more severe and longer lasting when the stressor is of human design.

" 'In rare instances there are dissociative-like states, lasting from a few minutes to several hours or even days, during which components of the event are relived and the individual behaves as though experiencing the event at that moment. Such states have been reported in combat veterans. . . .

" 'Symptoms characteristic of Post-traumatic Stress Disorder are often intensified when the individual is exposed to situations or activities that resemble or symbolize the original trauma (e.g., cold snowy weather or uniformed guards for death-camp survivors, hot, humid weather for veterans of the South Pacific).

" 'Increased irritability may be associated with *sporadic and unpredictable explosions of aggressive behavior, upon even minimal or no provocation. The latter symptom has been reported to be particularly characteristic of war veterans with this disorder. . . .* ' " (Italics supplied by defendant.)

defendant reportedly manifested symptoms characteristic of the PTSD suffered by the returning Vietnam War veteran. These included increased use of drugs and alcohol, a personality shift, hostility, explosive behavior, bar fights, suicide attempts, sleep disorder, a hyperalert state, a strong tendency to dissociate, and an upset reaction to symbols of Vietnam, such as green garbage bags, which reminded him of body bags, and certain music or words on the radio that reminded him of Vietnam. An individual suffering PTSD, Dr. Blunt stated, typically would seek avoidance of ideas or symbols that would trigger memory of the traumatic event. According to the report of Theresa Babbitt, defendant's former "common law" wife, defendant manifested symbol avoidance behavior in that he was upset by the sight of any kind of green garbage bag, and when he heard music on the radio that reminded him of Vietnam, he would get up and turn it off.

■ The evidence showed that Leah Schendel's apartment was on the way of one route from the Stix Bar to defendant's home and that because of her emphysema Ms. Schendel often kept the regular door of her apartment open, leaving only the screen door closed and locked. Relying on Dr. Blunt's testimony concerning defendant's likely adverse reaction to symbols of Vietnam, and evidence that when Ms. Schendel's body was found her television set was turned on to channel 40, with the sound off, defense counsel sought to introduce evidence of the movies shown on channel 40 the night of Ms. Schendel's murder in an effort to prove that the movies, containing sounds of gunfire and "Asian appearing people in evil roles,"[3] may have drawn defendant to Ms. Schendel's apartment and triggered his violent attack. The trial court sustained the prosecutor's relevance objection. Defendant argues that this ruling was error.

Except as otherwise provided by statute, no evidence is admissible except relevant evidence. (Evid. Code, § 350.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact . . . ." (*Id.*, § 210.) ■ The trial court is vested with wide discretion in determining the relevance of evidence. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) The court, however, has no discretion to admit irrelevant evidence. (*People* v. *Turner* (1984) 37 Cal.3d 302, 321 [208 Cal.Rptr. 196, 690 P.2d 669].) "Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose." (*People* v. *De La Plane* (1979) 88 Cal.App.3d

---

[3] The movies were "River of Mystery," starting at 11:30 p.m. and concerning the efforts of a diamond hunter to hire two explosive experts who are sought by a revolutionary leader in South America, and "Tokyo Joe," beginning at 1:34 a.m. and involving the return to Japan of a man who believed his wife had died there in a concentration camp.

223, 244 [151 Cal.Rptr. 843], disapproved on other grounds in *People* v. *Green, supra,* 27 Cal.3d at p. 39, fn. 25.)

■ In the instant case the trial court did not abuse its discretion in excluding the evidence of the violent movies shown on channel 40 the night of Leah Schendel's murder. There is no evidence that the television set was turned on before defendant attacked Ms. Schendel, or that defendant heard or saw either of the movies before he cut open Ms. Schendel's screen door and entered her apartment. The evidence is to the contrary.[4] Consequently, the program content of channel 40 would have no tendency in reason to prove or disprove defendant's mental state at the time of the offenses. ■ "The inference which defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence." (*People* v. *De La Plane, supra,* 88 Cal.App.3d at p. 242, italics in original.)

Defendant cites *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251] and *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99] for the proposition that the evidence was admissible notwithstanding the absence of any proof that he actually heard or saw the television before he forcibly entered Ms. Schendel's apartment or before he attacked her. The cases are distinguishable.

In *Burgener, supra,* 41 Cal.3d 505, we upheld the trial court's admission, over defendant's objection, of evidence that a substance on his shoes tested positive for blood (although it could have been some other substance), stating that the evidence "certainly has *some* tendency in reason to prove that [defendant] might have been present at the scene of a bloody shooting . . . ." (*Id.* at p. 527, italics in original; see Evid. Code, § 210.) The case is merely consistent with the principle that the trial court has broad discretion to determine the relevance of evidence (*People* v. *Green, supra,* 27 Cal.3d at p. 19), a discretion patently not abused under the facts. In *Hall, supra,* 41 Cal.3d 826, we rejected the principle that third-party-culpability evidence is admissible only on a preliminary showing of a " 'substantial probability' " of third-party guilt and reaffirmed the admissibility of "any relevant evidence that raises a reasonable doubt as to a defendant's guilt . . . ." (41 Cal.3d at p. 829.) Rejecting defendant's contention that his constitutional right to present a defense precludes any application of Evidence Code section 352 to third-party-culpability evidence because even remote evidence of motive

---

[4] As indicated, Vernon McMaster, Ms. Schendel's neighbor, testified that when he awakened between 2 a.m. and 4 a.m., he heard a thud or thump in Ms. Schendel's apartment, then nothing, then he heard the television go on, and that he did not hear the television before. Edna Smith, Ms. Schendel's other neighbor, testified that she was up until 2 a.m. and had heard nothing except Ms. Schendel arriving home from dinner about 11 p.m.

could raise a "reasonable doubt" of guilt, this court stated: "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]" (*Id.* at p. 834.)

In the instant case the excluded channel 40 program schedule would at most have provided a link in an incomplete chain of speculative inferences. Exclusion of the evidence was not an abuse of discretion.

b. *Sanity Phase.*

During the sanity phase of trial, defendant again sought to prove the contents of the channel 40 films and to demonstrate their potential connection with his actions. Defense counsel's offer of proof was made by way of cross-examination of Dr. Elmer F. Galioni, the court-appointed psychiatrist. The trial court ruled the evidence inadmissible pursuant to Evidence Code section 352. Defendant maintains that this ruling was an abuse of discretion and a violation of his due process right to present relevant defense evidence.

On direct examination by the prosecutor, Dr. Galioni testified that his diagnosis of defendant was that he had a passive-aggressive personality disorder. He described the condition as a character disorder where an individual rebels against society's expectations, and "when confronted with the need to maintain responsibility," he becomes aggressive and "may lash out openly aggressively." In Dr. Galioni's opinion, defendant's asserted amnesia about the offenses was either a "functional amnesia" that was developed after the fact to eliminate or blot out unpleasant memories, or a "feigned amnesia."

On cross-examination by defense counsel, Dr. Galioni testified that although some of defendant' reported behavior was consistent with a diagnosis of PTSD, he did not make that diagnosis because some elements did not fit, particularly the fact that defendant's behavior was not always avoidant. When an individual who suffers from PTSD encounters a stimulus that reminds him of the traumatic event, his natural reaction and instinct is to try to get away from it rather than going towards it.[5]

---

[5] As previously indicated, defense psychologist Dr. Blunt also testified that an individual suffering from PTSD typically would seek avoidance of stimuli that reminded him of the traumatic event.

Defense counsel then sought to examine Dr. Galioni about defense exhibit T, a certified copy of the channel 40 program log. At a hearing outside the presence of the jury, Dr. Galioni testified that without further information—how defendant got to Ms. Schendel's apartment, the circumstances of his entry, whether he heard the television, more evidence about defendant's disorder—it would be "speculative" for him to attach any significance to the program content of channel 40 in evaluating defendant's behavior the night of the Schendel offenses.

The trial court ruled that the consumption of time required for proof of the channel 40 program content and its connection to defendant's behavior outweighed the probative value of the evidence, "especially in view of [Dr. Galioni's] ultimate position in this matter."

This ruling was not error. In his offer of proof, defendant was unable to demonstrate that the inference concerning his state of mind sought to be drawn from the channel 40 program log was anything more than speculative. As previously stated, exclusion of evidence that produces only speculative inferences is not an abuse of discretion. (*People* v. *De La Plane, supra,* 88 Cal.App.3d at p. 242; *People* v. *Turner, supra,* 37 Cal.3d at p. 321; see Evid. Code, § 350.)

Relying on *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920] and its progeny, defendant asserts that the trial court's authority under Evidence Code section 352 to exclude relevant evidence must yield to his constitutional right to present a defense. The principle applies, however, only to "relevant and material" evidence. (*Washington* v. *Texas, supra,* at p. 23 [18 L.Ed.2d at p. 1025]; see *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [18 L.Ed.2d 1019, 87 S.Ct. 1920] ["critical" evidence].) ▇ As the court correctly stated in *People* v. *Reeder* (1978) 82 Cal.App.3d 543 [147 Cal.Rptr. 275]: "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense. In *Chambers* v. *Mississippi* [*supra,* 410 U.S. 284], it was held that the exclusion of evidence, vital to a defendant's defense, constituted a denial of a fair trial in violation of constitutional due process requirements. [¶] We do not mean to imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352." (*Id.* at p. 553, italics in original; see *People* v. *Hall, supra,* 41 Cal.3d 826, 834; see also *Crane* v. *Kentucky* (1986) 476 U.S. 683,

---

Although defendant argues that avoidance is not "necessarily consistent" with what is known about PTSD, in the instant case the only evidence on point was that a victim of the disorder would try to avoid the stressor.

689 [90 L.Ed.2d 636, 644, 106 S.Ct. 2142] [recognizing trial court's " 'wide latitude' " in making ordinary evidentiary rulings].)

■ Here, because defendant's evidence failed to meet the threshold requirement of relevance, its exclusion pursuant to section 352 did not implicate any due process concerns. (See *People* v. *Hall, supra,* 41 Cal.3d 826; *People* v. *Wright* (1985) 39 Cal.3d 576, 588 [217 Cal.Rptr. 212, 703 P.2d 1106].)

### 2. *Combat Records of Defendant's Vietnam Marine Company.*

■ Defendant complains that the court erred in excluding from evidence as not properly authenticated the four-volume combat history of his Vietnam Marine company obtained at defense counsel's request from the United States Marine Corps. Relying on Evidence Code section 1420,[6] defendant maintains that the cover letter bearing the signature of an appropriate United States Marine Corps official, and received in response to defense counsel's letter requesting the records, was sufficient to authenticate the records. Evidence Code section 1420, however, serves to authenticate only the cover letter, not the documents themselves.

Defendant also contends for the first time on appeal that the records were properly authenticated under Evidence Code section 1421.[7] The record does not show, however, nor was any argument made below that the contents of the records were known only to the author, as required by section 1421.

Moreover, any error in excluding the records was nonprejudicial. The record shows that defense counsel, acceding to the prosecutor's relevance objection to the four-volume history, ultimately sought to introduce only one page, a page showing that defendant had been wounded in Vietnam. There was a plethora of other evidence that defendant had suffered a head injury in Vietnam and the prosecutor conceded the point. The excluded page thus would merely have corroborated an undisputed fact.

### 3. *Hospital Records Concerning Defendant's Childhood Head Injury.*

In addition to his diminished-capacity theory of PTSD, defendant also contended that his ability to form the requisite criminal intent was curtailed

---

[6]Section 1420 provides: "A writing may be authenticated by evidence that the writing was received in response to a communication sent to the person who is claimed by the proponent of the evidence to be the author of the writing."

[7]Section 1421 provides: "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."

by organic brain damage and psychomotor epilepsy. Dr. Blunt testified that psychological tests administered to defendant indicated that he suffered from damage in the area of "the right temporal and the left parietal occipital region" of his brain, and that defendant might also suffer from psychomotor epilepsy, a condition in which one may perform apparently purposive acts while in an unconscious state. She attributed the postulated epilepsy to the presence of temporal lobe damage, possibly caused by head injuries defendant suffered from a bicycle accident when he was 12 years old. Defense counsel then asked Dr. Blunt, "[W]ould an injury to the right temporal region . . . and the left parietal at the age of . . . twelve years old be consistent with the development and results of various testing that you did with regard to the Luria-Nebraska test as it applies to Manuel P. Babbitt?" The court sustained the prosecutor's lack-of-foundation objection, stating that although there was evidence that defendant suffered some sort of head injury at age 12, there was no evidence that the injury involved the right temporal and left parietal occipital areas of the brain. Defense counsel conceded that because the pertinent medical records showing the precise nature of the injury had not yet been introduced into evidence, the question was premature. Counsel asserted that the records of Tobey Hospital in Massachusetts would show "where the damage was." When defendant subsequently sought to introduce the Tobey Hospital records, the court sustained the prosecutor's relevancy objection.

■ Defendant contends that the court's ruling excluding the records substantially impaired his ability to convince the jury that he suffered from brain damage. He maintains that if in fact there were objectionable items in the records, limiting instructions pursuant to Evidence Code section 355 or the deletion of the offending portions would have met the problem.

We first observe that the record does not disclose that the Tobey Hospital records would in fact have substantiated his theory of brain damage. The evidence is to the contrary. Dr. Blunt, who reviewed the records during trial, testified only that the records indicated that defendant suffered a "head injury primarily to the posterior portion of the head" and that the site of the swelling was "consistent" with one of the areas of the brain that she believed was damaged. In the sanity phase, moreover, Dr. Galioni, the court-appointed psychiatrist, testified that the Tobey Hospital records did *not* indicate damage to any specific area of the brain. Contrary to defense counsel's expectation, therefore, the records would not have shown "where the damage was."

Defendant, as proponent of the medical records, had the burden of demonstrating their relevance. (Evid. Code, § 403.) In the absence of an offer of proof of the records' relevance, or an offer to delete any offending portions,

the trial court's ruling excluding the records was not error. (Evid. Code, § 354.) Evidence Code section 355, relied on by defendant, is inapplicable. Section 355 provides for limiting instructions when evidence is admissible as to one party or for one purpose, but inadmissible as to another party or for another purpose. The section has no bearing on the admission of wholly irrelevant evidence, nor did defendant request a limiting instruction.

Finally, any error in excluding the hospital records was nonprejudicial. That defendant received a head injury when he was 12 years old was mentioned several times and was not disputed. The jury thus was fully aware of the injury to which the records pertained. (Evid. Code, § 354; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 4. *Other Evidence Supportive of Defendant's PTSD Defense.*

Defendant's brother, William Babbitt, testified at length concerning changes he observed in defendant since his return from Vietnam. He and Theresa Babbitt, defendant's former "common law" wife, both testified to a number of incidents that indicated that defendant was mentally ill. When, however, defense counsel proposed to have Theresa testify to remarks made by defendant demonstrating his adverse reaction to symbols of Vietnam, e.g., green trash bags, Vietnamese people, and certain songs played on the radio, the court sustained the prosecutor's objection that the evidence was self-serving hearsay. Defense counsel then formulated the question so as to call for Theresa's personal observations, whereupon the trial court sustained the prosecutor's Evidence Code section 352 objection that the probative value of the evidence was outweighed by its undue consumption of time and prejudicial effect.

Defendant maintains that evidence of his remarks was admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250, subd. (a)). This exception was not advanced below and therefore need not be considered on review. (See Evid. Code, § 354.) Moreover, defendant cites nothing in the record to support the argument that his state of mind at the time he made the asserted remarks to Theresa Babbitt had any bearing on his state of mind at the time he attacked the two victims in this case.

Defendant also contends that exclusion of the evidence under Evidence Code section 352 was an abuse of discretion. However, in the absence of any evidence supportive of a connection between defendant's reaction to symbols of Vietnam and his attacks on Leah Schendel and Mavis W., the trial court's ruling was not error. As the court observed, "I really don't see the relevance of that [defendant's reaction to Vietnamese people who had settled near him] in view of the fact that neither of the victims were

Vietnamese." Nor was there evidence that defendant encountered any Vietnamese or any other symbol of Vietnam before the attacks.

■ As we reiterated in *People* v. *Wright, supra,* "Section 352 directs 'the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty. Nonetheless, it cannot be said that the trial judge's ruling on this evidence, of which the probative value was slight and the chance of prejudice and confusion substantial, struck an improper balance and thereby constituted an abuse of discretion.' [Citation.]" (39 Cal.3d at p. 588.) ■ Here the probative value of the proffered evidence was de minimis and the chance of confusion substantial. Exclusion of the evidence was not an abuse of discretion.

Furthermore, except for defendant's reaction to Vietnamese people, the other items of evidence excluded from Theresa Babbitt's testimony, and more, were elicited from other witnesses. The jury heard evidence that defendant turned off music that reminded him of Vietnam; that he had difficulty sleeping; that he heard voices; he giggled; he had headaches and pain; he was upset by green garbage bags; he practiced yoga and took long walks; and he changed for the worse, becoming more violent, after being in Vietnam. Thus, any error in precluding Theresa Babbitt from answering certain questions about defendant was nonprejudicial. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### 5. *Standard of Review.*

■ Defendant argues that in assessing error in the exclusion of the above cited evidence the *Chapman* standard (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) applies, both because the error violated his constitutional rights to confrontation and due process and because this is a capital case.

Because we have determined that exclusion of the evidence was not error, we need not address the standard-of-review issue. Nevertheless, assuming arguendo that there was error, pursuant to our decisions in *People* v. *Burgener, supra,* 41 Cal.3d 505, 528, *People* v. *Hall, supra,* 41 Cal.3d 826, 836, and *People* v. *Wright, supra,* 39 Cal.3d at page 586, the applicable standard is *Watson, supra,* 46 Cal.2d 818. As indicated, exclusion of the evidence, if error, was nonprejudicial under the *Watson* standard.

Defendant asserts alternatively that the evidence is extremely close, thus requiring application of the so-called "refinement" of the *Watson* test articulated in *People* v. *Gonzales* (1967) 66 Cal.2d 482, 493-494 [58 Cal.Rptr. 361, 426 P.2d 929] and *People* v. *Briggs* (1962) 58 Cal.2d 385, 407 [24 Cal.Rptr. 417, 374 P.2d 257], viz., "Where the evidence, though sufficient to sustain the verdict, is extremely close, 'any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.' " (*People* v. *Gonzales, supra*; *People* v. *Briggs, supra.*) Without determining whether *Gonzales* and *Briggs* in fact modify the *Watson* test, we reject defendant's premise that this was a close case. (Cf. *People* v. *Powell* (1967) 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137] [distinguishing *Gonzales*].) In the trial court's view, the verdicts of guilt were supported "beyond any reasonable doubt under any or all of the theories advanced by the prosecution," and the evidence "established the defendant's sanity beyond any reasonable doubt." The record supports the trial court's determination.

C. *Instruction on "Presumption of Consciousness."*

One of the defense theories presented at trial was that of unconsciousness based on psychomotor epilepsy. Dr. Blunt, testifying for the defense, described a psychomotor epileptic condition as one "that results from problems in one or both of the temporal lobes of the brain where a person loses control or essentially is unconscious, but they are able to motivate and do things. And what actually occurs is that the outer cortex of the brain is essentially not functioning during those episodes . . . . They don't reason, they don't think, but . . . they can act, they can perform well-learned kinds of things like walking and eating and those kinds of things . . . things that we have so thoroughly learned . . . that they are almost automatic."

Dr. Blunt arrived at her diagnosis of psychomotor epilepsy after reading a transcript of Theresa Babbitt's testimony, "where [Theresa] described the starry [*sic*], glassy-eyed effect [*sic*] that [defendant] had during the episodes of violence that he had displayed with her, and also her understanding—her memory of him having no memory [of the events]." This testimony, Dr. Blunt stated, together with the previously described psychological testing of defendant, was "very consistent" with a diagnosis of psychomotor epilepsy.

Dr. Lee Coleman, testifying for the prosecution in rebuttal, stated that Theresa Babbitt's description of defendant's "glassy-eyed" look during violent episodes with her was insufficient to support a diagnosis of psychomotor epilepsy, in that in each instance defendant had been drinking, which could account for his behavior, and, moreover, he would become violent, and "a person who's having these temporal lobe seizures, . . . is not capable

of a coordinated, purposeful, directed violent attack because . . . the nature of the seizure itself would prevent such a thing." Defendant's claim of having no memory of the incidents was not in and of itself evidence of a seizure because he may or may not have been speaking the truth.

Persons experiencing a psychomotor seizure, Dr. Coleman stated, "may appear to be awake, but in fact, they are in a true altered state of consciousness because they cannot relate to you in any kind of normal way, they could not talk to you, . . . and what you see are . . . repetitive stereotype movements. . . . If what they are doing involved a coordinated thing . . . engaging in an activity that involves coordinated muscular complicated movement, they would not be able to continue that." They would be incapable, the doctor testified, of using or continuing to use a cutting instrument to cut a hole in a screen door, or of repeatedly inflicting purposeful traumatic injuries on another, or of removing drawers from dressers, dumping the contents out on a surface, and looking for things of value.

Dr. Globus, testifying in surrebuttal, indicated that defendant's conduct on the nights in question was not inconsistent with a theory of unconsciousness based on psychomotor epilepsy.

■■■■ Based on the foregoing evidence, the trial court instructed the jury in terms of CALJIC No. 4.30[8] and No. 4.31.[9] Relying on *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], *Francis* v. *Franklin* (1985) 471 U.S. 307 [85 L.Ed.2d 344, 105 S.Ct. 1965], *People* v. *Roder* (1983) 33 Cal.3d 491 [189 Cal.Rptr. 501, 658 P.2d 1302], and related cases, defendant contends that it was constitutional error for the court to instruct the jury on the CALJIC No. 4.31 so-called "presumption of consciousness" in that the instruction creates a mandatory, rebuttable

---

[8] CALJIC No. 4.30 (1979 rev.) provides: "A person who commits an act while unconscious is not guilty of a crime.

"This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause.

"Unconsciousness does not require that a person be incapable of movement.

"Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time the crime was committed, he must be found not guilty."

[9] CALJIC No. 4.31 (1979 rev.) provides: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense.

"If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious."

presumption that the jury would have understood as shifting to defendant the burden of proving unconsciousness.

 *Sandstrom, Franklin,* and *Roder, supra,* stand for the principle that it is a violation of due process to reduce the prosecution's burden of proving every element of the offense beyond a reasonable doubt. In *Sandstrom* and *Franklin,* both murder cases, the challenged instructions lightened the prosecution's burden of proving the element of intent.[10] (*Sandstrom* v. *Montana, supra,* 442 U.S. at pp. 523-524 [61 L.Ed.2d at p. 39]; *Francis* v. *Franklin, supra,* 471 U.S. at p. 307 [85 L.Ed.2d at p. 360].) In *Roder,* which involved the charge of a secondhand dealer receiving stolen property (§ 496, subds. 1, 2), the challenged instruction lightened the prosecution's burden of proving the element of knowledge.[11] (33 Cal.3d at p. 504.)

 Defendant argues that because unconsciousness completely negates the intent element of the charged crimes, proof of consciousness is a fact necessary to proof of intent. CALJIC No. 4.31, in creating a presumption of consciousness, therefore impermissibly lightened the prosecutor's burden of proving intent or, stated conversely, impermissibly shifted to defendant the burden of negating an element of the charged offenses.

The Attorney General responds that consciousness is not an element of the offenses, but rather, is an affirmative defense, and that placing on the defendant the burden of proving an affirmative defense does not violate due process. Section 26, he observes, provides that all persons are capable of committing crimes, except for certain specific classes including those "who committed the act charged without being conscious thereof."[12] The statute, he maintains, thus defines unconsciousness as an affirmative defense. Only

---

[10] In *Sandstrom,* the court struck the following instruction: " '[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.' " (442 U.S. at p. 513 [61 L.Ed.2d at p. 44].)

In *Franklin,* the court struck the instruction that " '[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.' " (471 U.S. at p. 311 [85 L.Ed.2d at p. 351].)

[11] In *Roder,* we held unconstitutional the statutory presumption that a defendant who receives stolen property under such circumstances as should cause him to make reasonable inquiry to ascertain the transferor's legal right to sell or deliver it, without making such reasonable inquiry, received the property knowing it to be stolen. (33 Cal.3d at pp. 500-501.)

[12] Other persons incapable of committing crimes pursuant to section 26 are children under the age of 14, absent clear proof of knowledge of the wrongfulness of the act charged; idiots; persons who acted under an ignorance or mistake of fact that disproves criminal intent; persons who acted through misfortune or by accident and without evil design, intention or culpable negligence; and persons (except in capital offenses) who acted under threats or menaces sufficient to show that they reasonably believed their lives would be endangered if they refused.

when there is evidence tending to show that the defendant was unconscious is the prosecution required to establish beyond a reasonable doubt that he was conscious. In these circumstances, the Attorney General concludes, to permit the prosecution to rely on the rebuttable presumption of consciousness is not a denial of due process.

In support of their respective arguments, both parties cite *Patterson* v. *New York* (1977) 432 U.S. 197 [53 L.Ed.2d 281, 97 S.Ct. 2319]. In *Patterson* the defendant was charged with second degree murder. Under New York law extreme emotional distress is a defense to the charge, but the burden is on the defendant to prove the defense by a preponderance of the evidence. Rejecting the contention that this scheme impermissibly shifts the burden of persuasion from the prosecutor to defendant in violation of due process, the high court noted that the affirmative defense of extreme emotional disturbance "does not serve to negative any facts of the crime which the State is to prove in order to convict of murder. It constitutes a separate issue on which the defendant is required to carry the burden of persuasion; and unless we are to overturn *Leland* [13] and *Rivera,* [14] New York has not violated the Due Process Clause, and Patterson's conviction must be sustained. [¶] We are unwilling," the court stated, "to reconsider *Leland* and *Rivera*. But even if we were to hold that a State must prove sanity to convict once that fact is put in issue, it would not necessarily follow that a State must prove beyond a reasonable doubt every fact, the existence or nonexistence of which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of the punishment." (*Id*. at pp. 206-207 [53 L.Ed.2d at p. 290].)

Concluding, the court stated: "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch. We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged. Proof of the non-existence of all affirmative defenses has never been constitutionally required; . . ." (432 U.S. at p. 210 [53 L.Ed.2d at p. 292].)

---

[13]*Leland* v. *Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002] (state may constitutionally require defendant to prove insanity defense beyond a reasonable doubt).

[14]*Rivera* v. *Delaware* (1976) 429 U.S. 877 [50 L.Ed.2d 160, 97 S.Ct. 226] (state may require defendant to prove insanity defense by a preponderance of the evidence).

Relying on the United States Supreme Court's statement that the defense of extreme emotional disturbance "does not serve to negative any facts of the crime which the State is to prove in order to convict" (432 U.S. at p. 207 [53 L.Ed.2d at p. 290]), defendant asserts that where, as here, the defense negatives an element of the offense—to wit, intent—*Sandstrom, supra,* 442 U.S. 510, *Franklin, supra,* 471 U.S. 307, and *Roder, supra,* 33 Cal.3d 491 require the prosecution to prove the absence of the asserted defense beyond a reasonable doubt and without the assistance of a presumption.

The Attorney General, by contrast, cites *Patterson, supra,* 432 U.S. 197, for the proposition that due process does not require the state to prove the nonexistence of an affirmative defense.

In *Engle v. Isaac* (1982) 456 U.S. 107 [71 L.Ed.2d 783, 102 S.Ct. 1558], the United States Supreme Court recognized that "the prosecution's constitutional duty to negate affirmative defenses may depend, at least in part, on the manner in which the State defines the charged crime. . . . A State may want to assume the burden of disproving an affirmative defense without also designating absence of the defense an element of the crime. [Fn. omitted.] The Due Process Clause does not mandate that when a State treats absence of an affirmative defense as an 'element' of the crime for one purpose, it must do so for all purposes." (*Id.* at p. 120 [71 L.Ed.2d at pp. 797-796].)

Pursuant to our statutory scheme, murder is defined as the unlawful killing of a human being with malice aforethought. (§§ 187-189.) The death, the causation, and the malice are the facts the state must prove beyond a reasonable doubt if the defendant is to be convicted of murder. (§§ 1096, 1105, subd. (a).) Unconsciousness is a defense. (§ 26.) ■ Although the state, once the defendant raises the issue, has assumed the burden of disproving unconsciousness, this fact of itself does not transform absence of the defense—consciousness—into an element of murder for purposes of due process analysis. This is true even though unconsciousness negates the elements of voluntariness and intent, and when not voluntarily induced is a complete defense to a criminal charge (§ 26, subd. Four; *People v. Sedeno* (1974) 10 Cal.3d 703, 717 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]). (See *Engle v. Isaac, supra,* 456 U.S. at p. 120 [71 L.Ed.2d at pp. 795-796].)

■ In sum, because consciousness is not an element of the offense of murder (nor of any offense), CALJIC No. 4.31 does not impermissibly shift to the defendant the burden of negating an element, nor does the instruction violate due process by impermissibly lightening the prosecution's burden of proving every element beyond a reasonable doubt. Consequently, there is no

constitutional impediment to the state's use of a rebuttable presumption in meeting its assumed burden—once the issue has been raised—to prove consciousness beyond a reasonable doubt. (See *Engle* v. *Isaac, supra,* 456 U.S. at p. 120 [71 L.Ed.2d at pp. 795-796]; *Patterson* v. *New York, supra,* 432 U.S. at p. 210 [53 L.Ed.2d at p. 292]; cf. *People* v. *Boyes* (1983) 149 Cal.App.3d 812 [197 Cal.Rptr. 105] [upholding former version of CALJIC No. 4.31].)

Defendant's effort to distinguish this case from *Patterson* on grounds that the unconsciousness defense negatives an element of the crime is unavailing. The United States Supreme Court's concern in *Patterson* that the defense of extreme emotional disturbance did not negative any facts of the crime that the state was required to prove related not to whether absence of the defense was an element (which the state would then be required to prove), but rather, to the nature of the defendant's burden of proof. ▓▓ The rule is that "when there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue." (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335].) When, however, the defense raises "factual issues collateral to the question of the accused's guilt or innocence [which] do not bear directly on any link in the chain of proof of any element of the crime" (*id.* at p. 964), there is no constitutional impediment to requiring the accused to prove the collateral facts by a preponderance of the evidence (*id.* at pp. 964-965). (See generally Jeffries & Stephan, *Defenses, Presumptions and Burden of Proof in the Criminal Law* (1979) 88 Yale L.J. 1325.)

In *Patterson,* because the emotional-distress defense raised factual issues collateral to the question of guilt and did not serve to negative any element of the crime charged, the state could constitutionally require the defendant to carry the burden of persuasion by a preponderance of the evidence. (432 U.S. at pp. 200, 206-207 [53 L.Ed.2d at pp. 286, 289-290]; see also *Martin* v. *Ohio* (1987) 480 U.S. 228 [94 L.Ed.2d 267, 107 S.Ct. 1098].) ▓▓ In the instant case, by contrast, defendant's burden was only to raise a reasonable doubt that he was conscious, and then only if the prosecution's proof did not of itself raise such a doubt. (Cf. *Martin* v. *Ohio, supra,* 480 U.S. at p. 233 [94 L.Ed.2d at p. 274] [to convict, jury had to be convinced that none of the evidence, whether offered by state or defendant, raised a reasonable doubt]; *People* v. *Loggins* (1972) 23 Cal.App.3d 597, 601-602 [100 Cal.Rptr. 528] [construing § 1105 concerning defendant's duty to come forward with evidence].) ▓▓ ▓▓ ▓▓ ▓▓ Hence, it is immaterial for present

purposes that the unconsciousness defense served to negative an element of the crime.[15]

CALJIC No. 4.31, moreover, cannot be read in a vacuum. ▮▮ As the United States Supreme Court has stated: "Analysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption. [Citation.] This analysis 'requires careful attention to the words actually spoken to the jury . . . , for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.' [Citation.]" (*Francis* v. *Franklin, supra,* 471 U.S. at p. 315 [85 L.Ed.2d at p. 354]; see also *People* v. *Burgener, supra,* 41 Cal.3d at pp. 538-539.)

▮▮ Here, in addition to standard instructions on the presumption of innocence, the prosecution's burden to prove every element of the charged offenses beyond a reasonable doubt, and the sufficiency of circumstantial evidence to prove intent or mental state,[16] the jury was instructed that

---

[15] Defendant has more than once mischaracterized the effect of CALJIC No. 4.31 as imposing on the defendant the burden to persuade the jury that he was unconscious. As indicated, the instruction requires only that the evidence raise a reasonable doubt that defendant was conscious. As the Supreme Court stated in *Martin* v. *Ohio, supra,* 480 U.S. 228 [94 L.Ed.2d 267], in upholding a statutory scheme that imposes on a murder defendant the burden to prove self-defense: "When the prosecution has made out a prima facie case and survives a motion to acquit, the jury may nevertheless not convict if the evidence offered by the defendant raises any reasonable doubt about the existence of any fact necessary for the finding of guilt. Evidence creating a reasonable doubt could easily fall far short of proving self-defense by a preponderance of the evidence." (*Id.* at p. 234 [94 L.Ed.2d at pp. 274-275]; see also Jeffries & Stephan, *supra,* 88 Yale L.J. at p. 1329, fn. 8.) The dissent in *Martin* also recognized the distinction between creating a reasonable doubt as to guilt and proving an affirmative defense. (480 U.S. at p. 240, fn. 3 [94 L.Ed.2d at p. 278, fn. 3].) Only the former is at issue in the present case.

[16] The jury was instructed that specific intent or mental state is shown by a defendant's statement of intent and by "the circumstances surrounding the commission of the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act," and that it may not find the defendant guilty "unless the proved circumstances not only are consistent with the theory that he had the specific intent or mental state but cannot be reconciled with any other rational conclusion."

The jury was further instructed that "if the evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, it is your duty to adopt that interpretation which points to the absence of specific intent or mental state."

unconsciousness was a complete defense, that evidence *had been received* which tended to show that defendant was unconscious, and that if it had a reasonable doubt that defendant was conscious, it *must* find him not guilty. (CALJIC No. 4.30, *supra,* fn. 8.) Placed in context, therefore, CALJIC No. 4.31 did little more than guide the jury as to how to evaluate evidence bearing on the defendant's consciousness and apply it to the issue, an issue that is capable of proof only by circumstantial evidence of the defendant's conduct. (Cf. *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101].)

We conclude, therefore, that given the entirety of the charge a reasonable juror could not have believed that defendant was required to persuade it that he was unconscious. Rather, the instructions taken as a whole clearly indicate the prosecution had the burden of proving beyond a reasonable doubt not only that defendant appeared to be conscious, but also that he in fact was conscious. (See *People* v. *Burgener, supra,* 41 Cal.3d at p. 540; compare *Francis* v. *Franklin, supra,* 471 U.S. at p. 319-320 [85 L.Ed.2d at p. 357] with *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 160-161 [60 L.Ed.2d 777, 794-795, 99 S.Ct. 2213].)

We note, finally, that even were we to assume, contrary to our determination, that CALJIC No. 4.31 implicates due process concerns, any error in giving the instruction would be harmless under the *Chapman* standard of review (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711]). (See *Rose* v. *Clark, supra,* 478 U.S. at pp. 582-583 [92 L.Ed.2d at pp. 473-474].) The defense and prosecution experts both testified that an individual experiencing a psychomotor epileptic seizure could perform "well-learned" or automatic "preprogrammed" kinds of activity, like walking or eating, but would be incapable of reasoned or coordinated complicated kinds of movement. Defendant's acts in the Schendel case clearly were purposeful, motivated behavior: Cutting open Ms. Schendel's screen door; ransacking her apartment and removing items of value; pulling her nightclothing above her breasts; placing a mattress on the trunk of her body and a teapot on her pubic area; tying a leather strap to her ankle; and inflicting repeated severe blows on her person. In the W. case the same is true: Demanding her car; beating her into unconsciousness; removing her lower clothing; and taking her cash and jewelry. The record thus establishes defendant's consciousness beyond a reasonable doubt. (See *Rose* v. *Clark, supra,* 478 U.S. at pp. 580-581 [92 L.Ed.2d at pp. 472-473]; *Pope* v. *Illinois* (1987) 481 U.S. 497, 502-503 [95 L.Ed.2d 439, 446, 107 S.Ct. 1918, 1922].)

D. *Prosecutorial Misconduct.*

In his closing arguments during the guilt and sanity phases of trial, the prosecutor made unflattering remarks about defendant's expert witnesses,

inveighed against psychiatric defenses and, in the sanity phase, suggested that a finding of not guilty by reason of insanity would let defendant "off the hook." Defendant contends that the prosecutor's comments constituted prejudicial misconduct.

Although some of the prosecutor's challenged remarks were made during closing argument in the guilt phase of trial, most were made during the sanity phase. Because defendant has discussed all the comments together, examining especially their cumulative effect in the sanity phase, we shall do the same.

We first observe that defendant failed to object at trial to any of the asserted instances of misconduct, nor was any admonition requested. Thus, defendant waived his right to raise the issue on appeal unless any harm flowing from the prosecutor's remarks could not have been cured by timely objection and admonition. (*People* v. *Green, supra,* 27 Cal.3d at pp. 34-35.) However, as we discuss below, defendant contends that counsel's failure to object constituted ineffective assistance of counsel. Because defendant's ineffective assistance claim requires that we examine the merits of his prosecutorial misconduct claim, we shall do so notwithstanding his failure to object. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

1. *Prosecutor's Appeal to the Passions and Prejudices of the Jury.*

 Defendant asserts that the prosecutor appealed to the passions and prejudices of the jury by impugning the expertise of the defense expert witnesses and by urging the jury to join in a crusade against psychiatric testimony in the courtroom. Defendant cites the following comments during the guilt phase: 1. "[P]sychiatrists have this self-anointed capacity to perceive things better than other people. . . ."

2. [In describing defense psychiatrist Dr. Globus]: "[W]hat *he* perceives *himself* to be, that is, an expert." (Italics added by defendant.)

3. [In describing defense psychologist Dr. Blunt]: "Just because she's testified before in six cases does not make her an expert, because you've got to look behind the facts and see what's going on."

4. "We are letting justice be decided on the basis of how well a psychiatrist can sell their bag of tricks."

5. [Describing psychiatrists]: ". . . because they are so vain as to think that they are capable of all these magical, mystical things that they say they are capable of . . . ."

These comments, defendant complains, improperly urged the jury to disregard the trial court's judicial determination (see Evid. Code, §§ 405, 720) that the defense psychiatrist and psychologist, Dr. Globus and Dr. Blunt, qualified as experts.

■■■■ The record discloses that the prosecutor, in making the challenged remarks, repeatedly referred to the testimony of prosecution rebuttal witness Dr. Lee Coleman, who expounded at length on his view that psychiatrists and psychologists have no business in the courtroom. In Dr. Coleman's opinion, psychiatric diagnosis is very unreliable and what a psychiatrist or psychologist does is an art, not a science. According to Dr. Coleman, there is nothing in the normal training of psychologists or psychiatrists that would allow either to make the inferences they are asked to make in legal proceedings concerning the mental state of defendants at the time of the charged offenses. Discussing what he perceived to be the deficiencies of the clinical interview that forms the basis for an expert's forensic opinion, Dr. Coleman stated: "Well, the first weakness has to do with the fact that . . . the expectation is there, that the doctor, as a result of this interview, will be able to form an opinion without the kind of guesswork and hunches that ordinary people would have to rely on. . . . In other words, there's an expectation that the doctor's doing something special. The truth is that they are not doing anything special, they are basically reading information, listening to a person talk, decid[ing] what you're going to believe, what you're not going to believe . . . . So there's often a misconception that something special has happened that [hasn't]."

Continuing, Dr. Coleman stated that "there seems to be a strong bias on the part of mental health professionals to believe what they are told . . . . I think that comes from the fact that in a normal clinical setting, there's no reason not to believe what you're being told because the patient comes to you with a problem and he has nothing to gain by not telling you the truth. But in a legal setting, there may be something to gain, but I think doctors have trouble making that shift and acting as a fact finder. I think they may be not as good as ordinary people in that respect." A clinical interview, the doctor concluded, is not a reliable and valid technique for coming to a legal conclusion in the forensic context, such as rendering an opinion as to whether or not a person could premeditate or deliberate at a particular point in the past.

The use of the person's history, going back to childhood, is equally infirm, according to Dr. Coleman. "[A] psychiatrist or psychologist is not able to take that information and reach conclusions from it that an ordinary person couldn't do."

Asked on cross-examination if the thrust of his testimony was to say "wait, don't consider this [psychiatric and psychological testimony] at all because it's unreliable," Dr. Coleman replied that that was not the import of his testimony: "[T]hat would be trying to change the law, because the law requires [the jury] to listen to it, to consider it, and in each expert's case to decide how much weight they want to give it. I am arguing as my opinion based on all the things I've said in terms of my background that it does not really—shouldn't be given any weight, that after being considered, it shouldn't be given any weight."[17]

Viewed in the context of Dr. Coleman's testimony, the prosecutor's comments disparaging the expertise of the defense psychologist and psychiatrist to form an opinion about defendant's mental state were based on the evidence. The comments went to the weight of the witnesses' testimony, not its admissibility. The remarks therefore were not improper. (See *People* v. *Green, supra,* 27 Cal.3d at p. 35; see generally *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], disapproved on other grounds in *People* v. *Green, supra,* at pp. 33-34.)

 During the sanity phase, defendant complains of the prosecutor's assertion that "in a sense *we have a social cancer in our community now, and it is this very process of allowing psychiatrists to come in and make their moral pronouncements disguised as medical opinion in the hopes of persuading jurors to let people off the hook,* so to speak, by saying that this very hard to get at type of thing, that is, the person's mental state, can be definitively defined by them simply going through their clinical interviews and going through their tests and projecting it to a time in the past. *That's a social cancer.*"[18] Continuing, the prosecutor stated: "*Now, we're not like surgeons who can take a scalpel and pull that out and get rid of it.* What we have in that sort of thing is men who have courage like Lee Coleman, to walk into the lion's den in the courtroom, men who have experience, and say we are making a mistake, we shouldn't be doing this, and let's not do it, and to stand up against his fellow psychiatrists who say hey, no problem, I can do these things. . . . [¶] *That takes a lot of courage, and that's the kind of thing, the kind of way that social cancers are removed, is like people like Lee*

---

[17] Dr. Coleman's testimony was supported by defense psychiatrist Dr. Axelrad, who in voir dire during the sanity phase stated that it was not within the expertise of psychiatrists to determine whether or not a person meets the legal definition of insanity: "That is a moral and legal question that the law has established should be arrived at by the people, the judge, or the jury." Asked by the prosecutor what training, experience, or education he had that makes him an expert in being able to render an opinion concerning whether defendant was legally insane at the time of the charged offenses, other than his training as a psychiatrist, Dr. Axelrad responded, "None."

[18] Italics here and in subsequent quoted comments is on the portions to which defendant objects.

*Coleman who had the courage to stand up and be heard, even in what may seem to be an unpopular cause.*"

These remarks, defendant complains, constituted an attack not against the specific testimony elicited about defendant, but against the entire process of permitting psychiatrists to testify on a defendant's behalf, and as such, were a call to the jury "to legislate judicial reform."

 We are of the view that the prosecutor's remarks approached misconduct. A prosecutor may vigorously urge his points as long as he does not act unfairly and may use appropriate epithets where warranted by the nature of the case and the evidence adduced. (See *People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 36-37 [88 Cal.Rptr. 789]; see also *People* v. *Mitchell* (1966) 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211], disapproved on other grounds in *People* v. *Green, supra,* 27 Cal.3d at pp. 33-34.) Here, however, the prosecutor's comments were directed not to evidence of defendant's mental state at the time of the offenses nor to the weight to be given his experts' testimony, but rather, challenged the entire system of permitting psychiatric testimony on behalf of criminal defendants. The remarks thus went beyond the evidence and beyond any legitimate issue in the case. The law permits a defendant to assert a psychiatric defense and to have expert witnesses testify in his behalf. The courtroom is not the proper forum to challenge the propriety of this system. The prosecutor's harangue therefore was inappropriate and is not to be condoned.

In the present case, however, the prosecutor's remarks, although skirting the edge of propriety, were clearly nonprejudicial. The prosecutor did not, as defendant maintains, urge the jury to remove the social cancer from the courtroom, but rather, stated that he and the jury could *not* do so; the asserted misuse of mental health testimony in the courtroom could be cured only by psychiatrists like Lee Coleman, who have the courage to stand up to their colleagues and say "let's not make these moral pronouncements disguised as medical opinion." Dr. Coleman, as indicated, had testified that he was not urging the jury to disregard the psychiatric testimony, because the law requires the jury to consider it. The court, moreover, instructed the jury that the law permitted expert testimony on the issue of defendant's mental capacity and that the jury should give such testimony the weight to which it found it to be entitled. Finally, defense counsel, as will appear below in our discussion of defendant's petition for writ of habeas corpus, was of the view that the jury was "not receiving" the prosecutor's remarks "the way they were sent."

### 2. *Unwarranted Personal Attacks on Defendant's Expert Witnesses.*

 Defendant asserts that the prosecutor also improperly attacked the integrity, motive and character of his expert witnesses by asserting that they testified solely for monetary gain and implying that they manufactured their testimony.

As an implication of manufactured testimony, defendant cites the following guilt phase comment by the prosecutor: "When the flatterers come to them and say we have a case for you, we have a case where, you know, you are as good, delve into the fact[s] and pull the facts out and come into court and tell us that this Manuel Babbitt didn't have any mental states that are required under the law for the crimes that he's charged with, so won't you do that?"

The thrust of this comment was, again, that psychologists and psychiatrists do not have any special skill that would allow them to tell the jury that an accused is not responsible for his crimes. Drawing by analogy on the story, "The Emperor's New Clothes," where the tailors through "overwhelming flattery" succeeded in appealing to the Emperor's vanity, the prosecutor stated that "we have an emperor in the form of [these] psychologists and psychiatrists who . . . are vain enough to think that they have these capabilities. . . . [¶] And so one day, the psychiatrists having [been] flattered to the point of thinking they have something they don't, come to court, . . . they have a parade and display all these things that they claim they have, which they really don't have, . . ."

These comments were based on Dr. Coleman's testimony about the limitations of psychiatric opinion on the issue of an accused's mental capacity to commit a crime. They did not imply a manufactured defense, but rather, a misconception on the part of forensic psychiatrists and psychologists about their expertise in making legal judgments. As such, the comments were not misconduct.

In other comments the prosecutor, defendant maintains, in effect argued that the psychiatric witnesses were "using" the criminal justice system to advance their own business interests and that they therefore should not be trusted.

The evidence showed that Dr. Blunt had been licensed as a psychologist only two years when she was employed by defense counsel, that in this time she had testified in five other cases, and that her efforts on defendant's behalf had earned her over $14,000. Dr. Globus had been in full-time

private practice less than two years at the time of trial and he spent up to two-thirds of his time doing forensic examinations. He had testified in 75 to 100 civil and criminal cases. Dr. Axelrad originally discussed a fee of $120 an hour, but he agreed to receive $80 an hour for his services. At the time of his testimony he had put 117 hours into defendant's case, thus earning himself $9,360.

These facts support an inference of the defense expert witnesses' economic motive to testify. ■■■ It is within the bounds of proper argument to attack the credibility of defense expert witnesses, and the weight to be given their testimony, based on the witnesses' compensation and the fact of their employment. (See Evid. Code, §§ 722, subd. (b), 780, subd. (f); *People* v. *Washington* (1969) 71 Cal.2d 1061, 1086 [80 Cal.Rptr. 567, 458 P.2d 479], disapproved on other grounds in *People* v. *Green, supra,* 27 Cal.3d at pp. 33-34.) ■■■ The prosecutor's comments thus were not misconduct.

3. *Suggestion That a Finding of Insanity Would Free Defendant.*

Relying on *People* v. *Criscione* (1981) 125 Cal.App.3d 275 [177 Cal.Rptr. 899] and related cases, defendant urges that the prosecutor improperly argued that a finding of not guilty by reason of insanity would relieve him from punishment for his actions and result in his being set free forthwith.

■■■ Defendant first cites the guilt phase comment that defendant is "simply a criminal, . . . and don't be misled by the disguise that has been attempted to be put over him to make him out something that he's not. . . . [¶] Everyday common criminal. For Dr. Globus to come in here and tell us anything different is the height of intellectual arrogance. His answer simply should have been to the question put to him, hey, I don't know, I can't tell you. And for him to say that it's likely that he had diminished capacity, it gives more credence to the things that Lee Coleman was saying, that psychiatrists have this self-anointed capacity to perceive things better than other people, and all they have to do is examine a few facts and *they are perfectly willing to come to court and absolve an individual such as Manuel Babbitt of all criminal responsibility* on such things as another doctor's report and a hypothetical question."

This comment was not improper. Dr. Globus, who testified for the defense on surrebuttal, had reviewed Dr. Blunt's report, but had not himself examined defendant. In response to defense counsel's hypothetical question concerning the mental capacity of a "thirty-two year old black male who may have suffered a head injury . . ." and whose history paralleled defendant's history, Dr. Globus offered the opinion that the individual had diminished capacity. Because the purpose and effect of a successful diminished

capacity defense is to reduce or absolve the defendant's criminal responsibility, the prosecutor's remark was a fair comment on the evidence.

 In the sanity phase, defendant again challenges the prosecutor's "social cancer" comment wherein he referred to "this process of allowing psychiatrists to come in and make their moral pronouncements disguised as medical opinion *in the hopes of persuading jurors to let people off the hook,* so to speak, by saying that this very hard to get at type of thing, that is the person's mental state, can be definitively defined by them. . . ."

The prosecutor's reference to letting people "off the hook, so to speak" was nothing more than a reiteration of his earlier statement about the willingness of some psychiatrists and psychologists to testify to an individual's insanity at the time of an offense. An accused who is found to have been insane is absolved of criminal responsibility (§§ 1016, 1026), and thus, in the colloquial, is "let off the hook." The comment was not improper.

 Defendant also complains of the prosecutor's comments in the sanity phase relating to Dr. Axelrad's diagnosis of intermittent explosive disorder, as follows: "Now, you know, we can all buy this little business of what diagnosis criteria Mr. Babbitt meets. But let me point out this one about the intermittent explosive disorder. And it's kind of got a little sex appeal, too. It's kind of tantalizing. Boy, that would just fit, intermittent explosive disorder. Here's this guy walking down the street, all of a sudden he gets mad and beats up on somebody. I'm going to find this guy crazy and *let him go home.* . . . [¶] I want to ask anybody if you lost your temper? You had intermittent explosive disorder. And let's not try to make anything out of it more than that, because if you do, everytime somebody gets mad, *they are free to commit any crime they want,* and they can be found not guilty by reason of insanity."

Dr. Axelrad had defined intermittent explosive disorder as "a mental disorder . . . which would include several discrete episodes of loss of control of aggressive impulses that result in serious assault or destruction of property. For example, with no or little provocation, an individual may suddenly start to hit strangers and throw furniture. . . . There are no signs of generalized impulsivity or aggressiveness between the episodes." Court-appointed psychiatrist Dr. Elmer Galioni testified with respect to the intermittent explosive disorder diagnosis that "Yes, there were some instances where [defendant] reacted explosively to some situations. . . . I think at least on one occasion he did abruptly hit his wife, when she, should I say, irritated him." But some elements of the diagnosis did not fit in that "there were still some general impulsivity in between the episodes, and his violent behavior was not always in response to a precipitating factor."

Based on the foregoing testimony, the prosecutor in his argument equated the asserted disorder to an individual's loss of temper and indicated that if the jurors ever had lost their tempers, then under Dr. Axelrad's analysis they too had intermittent explosive disorder, and hence were insane at the time. In asserting that they thus would be "free" to commit a crime, the prosecutor was referring not to a freedom from confinement, but to the freedom from criminal responsibility that follows from a finding of insanity. In light of the evidence, the prosecutor committed no impropriety in disparaging the intermittent explosive disorder diagnosis and arguing what he believed its logical extension to be.

 In sum, with the exception discussed below, none of the prosecutor's comments improperly suggested to the jury that if defendant were found to have been not sane at the time of the offenses, he would go free.

 The exception is the prosecutor's statement concerning someone who "gets mad and beats up on somebody," i.e., "I'm going to find this guy crazy and let him go home." To the extent the prosecutor was suggesting that when an accused is found insane he is let free, his comment was improper. (*People* v. *Modesto* (1967) 66 Cal.2d 695, 708-709 [59 Cal.Rptr. 124, 427 P.2d 788], disapproved on other grounds in *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383, fn. 8 [66 Cal.Rptr. 724, 438 P.2d 372] and *People* v. *Sedeno, supra,* 10 Cal.3d at p. 721; *People* v. *Criscione, supra,* 125 Cal.App.3d at p. 293; *People* v. *Mallette* (1940) 39 Cal.App.2d 294, 299-300 [102 P.2d 1084].) The question is whether the error was prejudicial.

In *People* v. *Smith* (1973) 33 Cal.App.3d 51 [108 Cal.Rptr. 698], disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324, footnote 5 [149 Cal.Rptr. 265, 583 P.2d 1308], the court determined that the prosecutor's implication in summation that "a finding of insanity would result in freeing the criminally insane and dangerous defendant" (*id.* at p. 71) was not prejudicial per se, but rather was governed by the *Watson* (*supra,* 46 Cal.2d 818) standard of review—i.e., whether there is a reasonable probability that in the absence of the misconduct the jury would have returned a finding more favorable to the defendant (33 Cal.App.3d at p. 71). (See also *People* v. *Beivelman, supra,* 70 Cal.2d at p. 75; *People* v. *Green, supra,* 27 Cal.3d at p. 36; cf. *People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].)

Distinguishing earlier cases finding similar misconduct to be reversible error, the court first reviewed a then-recent empirical study of jury behavior in insanity trials, which determined that—contrary to the expectations of the bench and bar—"jurors are generally aware that a criminally insane

person will be confined in a mental hospital until an authorized agency declares that he has recovered." (33 Cal.App.3d at p. 74. But see *People* v. *Moore* (1985) 166 Cal.App.3d 540, 544 [211 Cal.Rptr. 856].)

The court next observed that "[t]here is an independent reason for holding the misconduct harmless. Penal Code section 1026 permits the bifurcated guilt and insanity trials to be heard by the same or a different jury in the discretion of the court. Defendant's sanity trial took place before the same jury which had just found him in possession of the mental capacity for premeditated and deliberate killing. The jury was now being asked to decide whether, at the time of his attack on the campers, he had been legally insane . . . . The array of evidence at the guilt trial had moved the jury to reject the defense of mental illness depriving him of capacity to premeditate; the same evidence supplied a strong impetus for rejection of the insanity plea. It precluded any reasonable probability that the district attorney's impropriety influenced the jury's rejection of that plea." (33 Cal.App.3d at p. 74.)

Rejecting the proposition that in light of the foregoing conclusion a "defendant's plea of insanity comes before a biased jury when the same jurors have already rejected his claim of diminished mental capacity," the court stated that "[i]f indeed the jury is predisposed against a defendant on the insanity issue, its predisposition does not stem from its verdict at the guilt trial but from the *evidence* it has heard. A well-based verdict of capacity to premeditate does not foreclose a verdict of insanity, but makes it unlikely. [Fn. omitted.] The circumstantial evidence which supported the finding of undiminished capacity would be admissible on the insanity issue were the issues heard by the same or separate juries." (*Smith, supra,* 33 Cal.App.3d at p. 75, italics in original.)

Here, as in *Smith, supra,* 33 Cal.App.3d 51, any error in the prosecutor's single improper remark implying that if found insane defendant would be free to go home, was nonprejudicial. The jury had already rejected defendant's diminished-capacity defense at the guilt phase. Dr. Coleman's guilt phase testimony, discrediting the testimony of the defense psychiatrists and psychologists and the ability of such professionals to make accurate judgments about a defendant's mental state at the time of an offense, applied as well to the testimony produced at the sanity phase. Moreover, court-appointed psychiatrist Dr. Elmer Galioni testified at the sanity phase that in his view defendant suffered from nothing more than "passive-aggressive personality disorder." In Dr. Galioni's opinion, defendant did not at the time of the offenses suffer from a mental disorder that deprived him of the "substantial capacity to appreciate his criminality or to conform his behavior to the requirements of law." Although at the sanity phase it was defendant's burden to prove legal insanity by a preponderance of the evidence, in

the trial court's view, expressed in connection with its ruling on defendant's motion for modification of the penalty, "all of the evidence in fact *established the defendant's sanity* beyond any reasonable doubt." (Italics added.)

Additional circumstances further militate against any harm from the prosecutor's statement. Dr. Coleman, on cross-examination during the guilt phase, stated that when someone is found insane, the procedure is that "they are said to be not responsible legally, and they are sent to a mental institution for an indefinite period of time," they are confined until expiration of their maximum penalty, whereupon they are released unless the state can show that they continue to be a danger, in which case they are incarcerated longer. Defense counsel in his sanity-phase argument indicated that defendant would not go free when he analogized the jury's task to the decision faced by defendant's brother, William Babbitt, "when he turned in his sick brother, so that [he] could get treatment and the community would be safe. He saw that responsibility. He recognized and accepted that responsibility. He sought help and treatment, . . . I expect that you will act in no less responsible way than he did." Further, the court instructed the jury not to consider the subject of penalty or punishment in its deliberations on the sanity issue and that the matter of penalty or punishment must not in any way affect its verdict.

In light of these factors, we conclude that there is no "reasonable probability that the prosecutor's impropriety supplied an inducing factor in the jury's election to find defendant sane." (*People* v. *Smith, supra,* 33 Cal.App.3d at p. 75.)

*People* v. *Criscione, supra,* relied on by defendant, is distinguishable. In that case there were four instances of egregious misconduct, each one clearly prejudicial. (See 125 Cal.App.3d at pp. 284-292.) In cross-examination of the defense psychiatrist and in argument to the jury, the prosecutor repeatedly suggested that the criminally insane, "however violent, are immediately set free to prey upon society." (*Id.* at p. 292.) Thus, the prosecutor argued: " 'I hope working hard doesn't mean you're crazy, because we've got to start locking up a lot of people. *Of course, we don't lock them up. We just call them insane.*' " (*Ibid.,* italics added.) The reviewing court, moreover, had not long before considered misconduct by the same prosecutor. (*Ibid.*) Based on the totality of the circumstances, the court concluded that the prosecutor's misconduct deprived the defendant of a fair opportunity to have the jury determine his sanity at the time of the killing. (*Id.* at p. 293.)

In the instant case the prosecutor's comment, although improper, did not deprive defendant of a fair sanity hearing nor did it result in a miscarriage of justice.

### E. *Ineffective Assistance of Counsel.*

Defendant asserts that defense counsel's failure to object to the numerous instances of prosecutorial misconduct denied him the effective assistance of counsel. In light of our previous discussion, we reject defendant's premise that there were such numerous instances. Rather, we consider defendant's ineffectiveness claim with respect only to counsel's failure to object to the prosecutor's questionable "social cancer" remarks and the improper comment "find him crazy and let him go home."

The burden of proving ineffective assistance of counsel is on the defendant. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839]; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; *People* v. *Pope, supra*; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" (*People* v. *Pope, supra,* 23 Cal.3d at pp. 425-426), the case is affirmed (*ibid.*). In such cases, the ineffective-assistance claim is more appropriately made in a petition for habeas corpus. (*Ibid.*; see *People* v. *Ledesma, supra,* 43 Cal.3d at p. 218.)

Here the appellate record sheds no light on why counsel failed to object to the prosecutor's "social cancer" and "let him go home" comments. Even assuming, however, that a reasonably competent attorney acting as a diligent advocate would have objected, neither comment, as our previous discussion concludes, was prejudicial. Consequently, it is not reasonably probable that a determination more favorable to defendant would have resulted had counsel objected and sought an admonition. (Cf. *People* v. *Phillips* (1985) 41 Cal.3d 29, 60 [222 Cal.Rptr. 127, 711 P.2d 423].) Defendant, therefore, has not established his ineffectiveness claim on appeal.

### III. PETITION FOR HABEAS CORPUS

Defendant has filed in this court a petition for writ of habeas corpus in which he asserts the same ineffective assistance of counsel claim as

he advances on appeal. We consolidated the petition with the appeal and issued an order to show cause. The Attorney General filed a return, and defendant filed a denial. The factual contentions set forth in the petition are identical to those discussed in the context of the appeal and are uncontradicted. Attached to the petition is trial counsel's declaration setting forth his reasons for failing to object to the prosecutor's challenged remarks.[19] However, because our review of the entire record, as determined above, indicates that counsel's failure to object was nonprejudicial (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; *People* v. *Pope, supra,* 23 Cal.3d at p. 425; see *Strickland* v. *Washington, supra,* 466 U.S. at p. 697 [80 L.Ed.2d at pp. 699-700]), it is unnecessary to explore counsel's reasons.

The order to show cause must be discharged and the petition for writ of habeas corpus denied.

## IV. SPECIAL CIRCUMSTANCE FINDINGS

■ Relying on *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], defendant contends that the felony-murder special-circumstance findings must be set aside because the court failed to instruct the jury that it could find the special circumstance allegations true only if it found that defendant acted with intent to kill.

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] we reconsidered our *Carlos* decision. We concluded that the court need not instruct on intent to kill as an element of the felony-murder special circumstance unless there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.* at p. 1147.) In the instant case it is undisputed that defendant was the actual killer of Leah Schendel. Failure to instruct on intent therefore was not error.

---

[19] Concerning all but the "let him go home" remark, counsel states that he did not object because he did not feel the remarks were objectionable. Counsel states additionally that he refrained from objecting to the "social cancer" remarks for tactical reasons, "because it appeared . . . that the jury was not receiving [the remarks] the way they were being sent" and he did not wish to dignify the comments with an objection. Concerning the "let him go home" comment, counsel states that he did not object "because it was a quick comment, interspersed in the midst of what I considered to be appropriate and fair comment by the prosecutor. On 20/20 hindsight, I feel that it was an objectionable statement, and that I should have objected at the time. In rethinking my situation at the time, I do not recall why I did not object."

## V. Penalty Phase

### A. *Carryover of Prosecutorial Misconduct.*

 Defendant argues that the prosecutor's improper remarks during the guilt and sanity phases, impugning his mental defenses and the integrity of his expert witnesses, necessitate reversal of the penalty determination because the remarks went to the issue at the core of his penalty defense: i.e., whether his conduct should be considered any less blameworthy because it was, according to the defense, the product of mental disease and Vietnam war trauma. Citing *Lockett v. Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] and *Eddings v. Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], defendant asserts that the prosecutor's misconduct deprived him of his constitutional right to have the jury consider his mental defense as mitigation.

As indicated previously, most of the prosecutor's challenged remarks were made during the sanity phase of trial. The comments were directed to persuading the jury to reject defense evidence that at the time of the offenses defendant was legally insane. At the penalty phase, by contrast, the prosecutor in closing argument expressly recognized the existence and potential mitigating effect of defendant's mental problems. In addition, pursuant to CALJIC No. 8.84.1 the court instructed the jury to consider in determining penalty whether at the time of the offense defendant was under the influence of extreme mental or emotional disturbance or was suffering from mental disease or defect and whether there was any other circumstance which extenuated the gravity of the crime. (CALJIC No. 8.84.1 (d), (h), (k); § 190.3, factors (d), (h), (k).) These instructions in effect directed the jury to consider the evidence of defendant's mental problems. Consequently, any impropriety in the prosecutor's asserted broad attack against psychiatric evidence was nonprejudicial.

### B. *Nonstatutory Aggravating Factors.*

 Defendant complains that the court instructed the jury that in determining penalty it could consider all of the evidence which had been received during any part of the trial and refused to modify CALJIC No. 8.84.1 to specify that the jury could consider only evidence relevant to the statutory aggravating circumstances.

In *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we held that in determining penalty the jury can consider in aggravation only evidence that bears upon one of the statutory listed factors exclusive of factor (k) (*id.* at pp. 775-776) and that the prosecutor was not entitled to

introduce in aggravation evidence of defendant's "background, character, or conduct which is not probative of any specific listed factor," exclusive of factor (k) (*id.* at p. 774). We stated further, however, that once the defense has presented background and character evidence admissible under factor (k), relevant and specific prosecution rebuttal evidence is admissible. (*Id.* at p. 776; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790-792 [230 Cal.Rptr. 667, 726 P.2d 113].) Once a defendant places his general character in issue, "the prosecutor [is] entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." (*People* v. *Rodriguez, supra,* at p. 791.) In *Boyd* we were concerned not with any perceived ambiguity in CALJIC No. 8.84.1, but with prosecution evidence and argument improperly directed to nonstatutory aggravating factors. (*People* v. *Boyd, supra,* 38 Cal.3d at pp. 772-779; see *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779 [upholding 1978 law despite failure to exclude nonstatutory aggravating factors as a basis for the death penalty].)

In the instant case the prosecutor did not introduce nonstatutory aggravating evidence at the penalty phase nor did he argue that specific nonstatutory factors could be considered in aggravation. However, anticipating defense counsel's closing argument concerning defendant's background and character evidence, the prosecutor stated: "Now, you may also consider the general background, character, history of Manuel Babbitt. While I'm sure there are a lot of things that Mr. Schenk [defense counsel] will rely on in saying that this [evidence] is a mitigating factor, I only point out to you that you know a little bit about Manuel Babbitt, and a lot of it isn't nice. *And you may consider any of that material concerning his character and background as an aggravating factor in determining what the punishment should be.*" (Italics added.) Defendant argues that the italicized comment permitted the jury to consider in aggravation such nonstatutory factors shown by evidence at the guilt phase as his theft of his brother's car, his illicit sexual relations with a woman not his wife, his fathering of two children by Theresa Babbitt without legal marriage, and his post-Vietnam consumption of illegal drugs.

Defendant's failure to object compromises his argument. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 791.) In any event, the point lacks merit. It is apparent that the thrust of the prosecutor's remarks was to rebut defense counsel's anticipated argument concerning the mitigating effect of defendant's background and character evidence by reminding the jury of the negative aspects of defendant's character and history—his prior felony convictions and his numerous acts of violence to strangers and family alike, evidence which could properly be considered in aggravation as well as in

rebuttal.[20] Viewed in light of the entire record, the comment could not have misled the jury. At the outset of the penalty phase the court informed the jury that although it could consider the evidence it had previously heard, it was to view the evidence for the "different purpose" of determining penalty, and in considering the evidence, it was to "take into account and be guided by" the applicable aggravating and mitigating factors as to which it would be instructed. The prosecutor repeated this admonition, followed by enumeration of the aggravating factors the jury could properly consider. Defense counsel in closing argument also enumerated the aggravating factors the jury could properly consider. Counsel expressly informed the jury that it was not entitled to consider defendant's nonviolent criminal activity, specifically mentioning defendant's theft of his brother's car, and cited defendant's possible intoxication or use of drugs as a mitigating factor. Thereafter the court properly instructed the jury as to the factors it could consider in determining penalty.

Assuming, therefore, that the *Boyd* directives (*supra,* 38 Cal.3d 762) apply retroactively—an issue that we have not decided (see *People* v. *Howard* (1988) 44 Cal.3d 375, 441 [243 Cal.Rptr. 842, 749 P.2d 279])—we conclude that the prosecutor's single nonspecific reference to defendant's background evidence as aggravating could not reasonably have misled the jury concerning the evidence it could consider in determining penalty.

Furthermore, even were we to assume that the jury may have been misled as to the use of nonstatutory aggravating evidence, under any test of prejudice the error could not have affected the penalty verdict. In light of defense counsel's closing argument advancing defendant's possible drug use as a mitigating factor and excluding the theft of his brother's car as aggravating, the only guilt phase evidence the jury may possibly have improperly considered was the evidence related to defendant's illicit sexual relationship with a woman not his wife and his fathering of two children without benefit of marriage. Viewed in light of all the aggravating evidence properly presented to the jury—the circumstances of the crime itself, including the defenselessness of the victim, defendant's prior felony convictions, his attack on Mavis W., his violent conduct toward his first wife and Theresa Babbitt and his other violent outbursts—consideration of this evidence clearly was nonprejudicial.

---

[20] The record shows that the prosecutor felt at a disadvantage in light of the court's ruling that the prosecution would have the opening argument and the defense the closing argument, with no opportunity for rebuttal. Objecting to this procedure, the prosecutor stated: "I just would like to point out, your Honor, that in my judgment, the—this procedure is unfair to the People, for it allows the defendant to not only rebut anything I say, but to say anything he wants to say unrebutted."

## C. *Instruction on Mitigation.*

The court instructed the jury in terms of former CALJIC No. 8.84.1 without clarifying that factor (k) of section 190.3 permits the jury to consider any aspect of the defendant's character or record as mitigating evidence. (*People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Defendant contends that the trial court's refusal to give his proposed clarifying instruction on mitigation[21] deprived him of the opportunity to have the jury consider all his mitigating evidence as required by *Lockett* v. *Ohio, supra,* 438 U.S. 586.

 Pursuant to *Lockett* v. *Ohio, supra,* a defendant is entitled to have the jury consider as a mitigating factor "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (438 U.S. at p. 604 [57 L.Ed.2d at p. 990], 'fn. omitted.) We have determined that section 190.3, factor (k) satisfies the *Lockett* directive. (*People* v. *Brown* (1985) 40 Cal.3d 512, 541 [93 L.Ed.2d 934, 107 S.Ct. 837], revd. on other grounds, *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], see *People* v. *Easley, supra,* 34 Cal.3d 858, 878.) However, in order to avoid any potential misunderstanding, in *People* v. *Easley, supra,* we imposed the prospective requirement that trial courts expressly inform the jury that it may consider character and background evidence as well as mitigating evidence that relates to the crime. (34 Cal.3d at p. 878, fn. 10.) Failure of trial courts prior to *Easley* to give the clarifying instruction does not necessarily invalidate a death penalty verdict. Rather, our task is to review each such prior case on its own merits to determine whether in context the jury may have been misled concerning the scope of the evidence to be considered in its sentencing determination. (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17; see *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 786-787; *People* v. *Miranda* (1987) 44 Cal.3d 57, 102-103 [241 Cal.Rptr. 594, 744 P.2d 1127]; see also *People* v. *Ghent* (1987) 43 Cal.3d 739, 777-778 [239 Cal.Rptr. 82, 739 P.2d 1250] [1977 law].)

 In the instant case nothing in the court's instructions or the prosecutor's argument suggested to the jury that it should not consider

---

[21] Defendant requested the court to give the following instruction after CALJIC No. 8.84.1: "However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Mr. Babbitt. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this Case. But you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances relating to the case or to the defendant, Mr. Babbitt, as reasons for not imposing the death sentence."

defendant's mitigating evidence. To the contrary, the prosecutor, as discussed previously, expressly informed the jury that it could consider defendant's "general background, character, [and] history," and noted that defense counsel would argue that these considerations were mitigating factors. Implicitly recognizing the potential mitigating effect of the evidence, the prosecutor sought to rebut it. Addressing the testimony of defendant's family that he was a loving person, the prosecutor asserted that theirs was a distorted picture—defendant had been on his best behavior in his contacts with his family. Addressing defense counsel's anticipated reference to defendant's combat service in Vietnam, the prosecutor stated that this would be a way of "diverting attention, trying to make you feel bad, trying to make you feel responsible for the death of Leah Schendel, . . ." He pointed out that the war happened "a long time ago" and urged the jury to remember that its task was "to assess the criminal responsibility of one Manuel Babbitt, and not his conduct in the Vietnam War." "Is this the kind of murder where we ought to be sensitive to the needs of the person who committed it?" he asked rhetorically. "Is this the kind of murder where we have to be understanding about the circumstances under which it was committed?"

In sum, the prosecutor's argument was premised on the relevance of defendant's background and character evidence. Defense counsel's argument reinforced the premise. Factor (k), counsel argued, was "the most important consideration" in the weighing process. Fulfilling the prosecutor's expectation, defense counsel cited as factors in mitigation within the ambit of factor (k) that defendant's family believed him to be a loving, caring person and that starting when he was only 17 years old defendant served two tours of duty in Vietnam, earning several medals and citations. Counsel further argued that defendant is a religious person, that he loves his children and his ex-wife, and that he got Theresa Babbitt off of drugs. On this record, we conclude that there exists " 'no legitimate basis' " for believing that the jury was misled concerning its responsibility to consider all of the mitigating evidence in the case. (*People* v. *Ghent, supra,* 43 Cal.3d at p. 777, citing *California* v. *Brown, supra,* 479 U.S. at p. 546 [93 L.Ed.2d at p. 943] (conc. opn. of O'Connor, J.).)

D. *Sentencing Discretion.*

The jury was instructed pursuant to former CALJIC No. 8.84.2 that "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant argues that the mandatory language of this instruction precludes the jury from making the individualized sentencing determination required by *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.), *Lockett* v. *Ohio, supra,* 438 U.S. 586, 604

[57 L.Ed.2d 973, 989-990], and *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 110-112 [71 L.Ed.2d 1, 8-9].

In *People* v. *Brown, supra,* 40 Cal.3d at page 544, we upheld the 1978 death penalty statute against a challenge that it withdraws constitutionally compelled sentencing discretion from the jury. (See also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1279, fn. 38 [232 Cal.Rptr. 849, 729 P.2d 115].) To forestall any possible confusion we directed trial courts in the future to instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in *Brown*. We stated that whether the jury in a pre-*Brown* case has been misled so as to prejudice the defendant depends on a case-by-case analysis. (*People* v. *Brown, supra,* at p. 544, fn. 17.)

The prosecutor in the instant case referred extensively to the jury's weighing function and the difficulty of its ultimate decision. He first stated that the jury had an "awesome and a grave decision to make, . . . one . . . that will cause you all some emotional turmoil, . . ." However, he stated, "you can simply retreat to the safe haven of the law and catalog the aggravating factors and consider them, consider what weight they have, and catalog whatever mitigating factors you might find, and consider what weight they have, and then attempt to make a balancing. . . ." Later, after reciting what he believed were the applicable aggravating and mitigating circumstances, he concluded that "when you weigh the factors, I think the scale will clearly bottom out in favor of the aggravating factors."

The prosecutor then discussed at length the jury's responsibility to determine the appropriate punishment for defendant. For three pages of transcript he emphasized that this difficult responsibility had befallen the jurors, that they must not shirk their duty, that justice is ultimately in the hands of individual citizens who are called upon to be jurors. The issue, he urged, is whether they, the jurors, will have the courage to put aside the emotions of their hearts and to make the necessary decision in this case, the individual and collective good judgment to find the "true, just, and appropriate punishment." They were, he stated, "in effect the conscience of the community." Their individual consciences would best be served "by making the hard decision that must be made with your head and not your heart." He urged those of the jury who found their way to the just and necessary decision more readily than others "to have compassion and patience for those of you for whom it will be a more difficult decision, because each of you must struggle within yourselves to find that little corner of yourself that will allow us to do what is the right thing in this case. . . ."

Defense counsel similarly emphasized the jury's weighing function and the individual discretion of each juror to reach a conclusion which he or she

thought just. "What is the concept of outweigh? Is it a quality or a quantity of outweigh? Is this something you put in a computer . . . ? I don't think so. [¶] Should one mitigating factor outweigh all the aggravating when you're considering taking a man's life? I believe it's a qualitative evaluation. And you are required to consider it in that light. [¶] There is no statement in the law of this State that says death is automatic . . . . The law does not require it. It gives the decision to you. There is no road that leads directly to death. [¶] The oath of a juror does not require you to be a faceless executioner of Manny Babbitt. It does not require. And a unanimous decision is required."

In light of the arguments of both the prosecutor and defense counsel, the jury could not have been misled by the unadorned instruction about its sole responsibility to determine, based on its individualized weighing discretion, whether death was appropriate in this case. (See *People* v. *Allen, supra,* 42 Cal.3d at pp. 1278-1280; *People* v. *Miranda, supra,* 44 Cal.3d at p. 104.)

E. *Reference to Inapplicable Statutory Mitigating Factors.*

 Pursuant to CALJIC No. 8.84.1, at the conclusion of the penalty phase the court instructed the jury that it "shall consider . . . if applicable" each of the enumerated statutory aggravating and mitigating factors (§ 190.3). Defendant contends that the trial court's failure sua sponte to delete reference to inapplicable mitigating factors permitted the jury to treat the absence of such factors as aggravating factors.

We previously have rejected the contention that the trial court is required to delete inapplicable mitigating factors from CALJIC No. 8.84.1. (*People* v. *Miranda, supra,* 44 Cal.3d 57, at pp. 104-105; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777.) Although the absence of any of the statutory factors should not be considered aggravating (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]), implicit in our previous decisions is the conclusion that CALJIC No. 8.84.1 does not of itself suggest to the jury that it may consider the absent statutory mitigating factors in aggravation.

In the instant case there was no instruction given nor prosecution argument made that might have led the jury to the improper use of absent mitigating factors. Indeed, the prosecutor made no reference to the absent factors, discussing only the mitigating factors relied on by defendant. Defense counsel, in turn, went through the entire list of factors, informing the jury which of the mitigating factors did not apply.

F. *Age as an Aggravating Factor.*

Pursuant to CALJIC No. 8.84.1, the court instructed the jury that it should consider and take into account the defendant's age at the time of the crime. (See § 190.3, factor (i).) Observing that age cannot be deemed an aggravating factor (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 789), defendant argues that CALJIC No. 8.84.1 is defective in that it permits the jury to consider a defendant's age in aggravation, a mistake, he asserts, that the trial judge in this case made. (See *post* at p. 723.)

We decline to find the instruction fatally ambiguous. In *People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149], in rejecting the claim that a failure to specify which of the factors were aggravating and which mitigating made former section 190.3 invalid, we stated, "We believe that the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case." We see no reason to conclude otherwise concerning the almost identical provisions of the 1978 law.

It is true that "mere chronological age . . . should not of itself be deemed an aggravating factor." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 789, italics deleted.) Neither should it be deemed a mitigating factor. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) "Age alone is plainly 'a factor over which one can exercise no control' (*Rodriguez, supra,* at p. 789) and as such is not relevant to the issue of penalty." (*Lucky, supra.*) Rather, as we explained in *Lucky, supra,* "age" as used in statutory sentencing factor (i) is "a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (45 Cal.3d at p. 302.)

Here the prosecutor observed that "sometimes it's kind of hard to determine whether or not a person's age should be a mitigating factor or aggravating factor." Continuing, he stated that defendant, 31 years old at the time of the offenses, was not a "young person in their early twenties or eighteen, nineteen years old, that you might consider the fact of their relative immaturity. . . . [¶] By the same token, he isn't so far down the line to an older age where you might want to consider his relatively advanced age. He's really in that age where he should know better and has no excuse for committing the crimes that he's committed." These remarks were not error. (*People* v. *Lucky, supra,* 45 Cal.3d at p. 302.)

G. *Failure to Clarify Which Guilt Phase Instructions Applied to Penalty Phase.*

 Defendant claims that the trial court's failure sua sponte to instruct the jury as to which of the guilt and sanity phase instructions applied in the penalty phase denied him a fair penalty phase trial. He asserts that if the jurors ignored all the guilt and sanity phase instructions in their penalty deliberations, then it left the jury without guidance as to how to assess witness credibility[22] and created the possibility of an adverse inference from defendant's failure to testify. If, on the other hand, the jury believed that the guilt and sanity phase instructions applied at the penalty phase, defendant was denied a fair penalty determination because the jury was instructed at the guilt phase not to be influenced by sympathy for defendant and to disregard the consequences of its decision.

 We first observe that in the penalty phase, as in the guilt phase, the trial court has no sua sponte duty to instruct the jury on the defendant's failure to testify. (*People* v. *Melton* (1988) 44 Cal.3d 713, 758-759 [244 Cal.Rptr. 867, 750 P.2d 741].) Further, we question defendant's premise that at the penalty phase the jury either applied or rejected in toto all of the guilt phase instructions. The language of the no-sympathy instruction (CALJIC No. 1.00) refers specifically to deciding a defendant's guilt or innocence.[23] The instructions on witness credibility (CALJIC No. 2.20)[24] and the defendant's failure to testify (CALJIC Nos. 2.60, 2.61),[25] by contrast, make no reference to the issue of guilt or innocence. The jury

---

[22] We observe that the only witnesses to testify at the penalty phase were defense witnesses.

[23] CALJIC No. 1.00 provides in part: "Whether a defendant is to be found guilty or not guilty depends upon both the facts and the law. [¶] As jurors you have two duties to perform. One duty is to determine the facts of the case . . . . [¶] . . . You must accept and follow the rules of law as I state them to you. [¶] As jurors you must not be influenced by pity for a defendant or by prejudice against him. . . . [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

[24] CALJIC No. 2.20 states in its first paragraph: "Every person who testifies under oath . . . is a witness. You are the sole judges of the believability of a witness and the weight to be given to his testimony."

[25] CALJIC No. 2.60 provides: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that he does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way."

CALJIC No. 2.61 provides: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element."

therefore could reasonably have understood that the former did not apply to the penalty phase, whereas the latter did apply. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].)

The question, in any event, is whether the jury may have been misled into applying the antisympathy guilt phase instruction at the penalty phase. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 785; see *People* v. *Ruiz* (1988) 44 Cal.3d 589, 624 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Melton, supra,* 44 Cal.3d at p. 761; cf. *California* v. *Brown, supra,* 471 U.S. at pp. 544-546 [93 L.Ed.2d 934, 107 S.Ct. 837](conc. opn. by O'Connor, J.).) As discussed earlier, both the prosecutor and defense counsel argued the weight of defendant's mitigating evidence, specifically including evidence relating to his background, character and history. The jury was not told that it could not consider sympathy. Nor is there any indication that it may have been misled into applying the antisympathy guilt phase instruction at the penalty phase. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 786.) We conclude that the trial court did not err in failing to give additional clarifying instructions on the subject of sympathy at the penalty phase. (*People* v. *Ruiz, supra,* 44 Cal.3d at p. 624; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 102-103.)

██ We similarly reject defendant's argument that there was a prejudicial carryover effect from the final portion of CALJIC No. 1.00, which read "you will reach a just verdict regardless of what the consequences of such verdict may be." As with the guilt phase antisympathy instruction (se *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 785), the potential for confusion from the guilt phase instruction to disregard the consequences is attenuated at the penalty phase. Consequently, the question is whether on review of the record as a whole it appears that an abstract possibility of prejudice may have been realized. (See *People* v. *Melton, supra,* 44 Cal.3d at pp. 759-760; cf. *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 785.)

Here both the prosecutor and defense counsel emphasized to the jury the gravity of its decision. Thus, the prosecutor stated, "[Y]ou have an awesome and a grave decision to make, . . . [one] that will cause you all some emotional turmoil." Defense counsel stated: "You are going to have to consider the fate of Mr. Babbitt. . . . [Y]our decision, should it be death, is a premeditate[d], deliberate, cruel, calculated killing. All twelve of you can decide to kill someone. . . . [¶] You are going to have to face your decision. . . ." We conclude that the jury could not have been misled as to its responsibility to consider the consequences of its decision.[26]

---

[26]To avoid any possible confusion in future cases, trial courts should expressly inform the jury at the penalty phase which of the instructions previously given continue to apply.

## H. *Dual Use of Aggravating Factors.*

Defendant contends that the trial court's failure sua sponte to modify CALJIC No. 8.84.1 improperly permitted the jury to consider the circumstances of Leah Schendel's death under both factors (a) and (b) and his 1973 Massachusetts robberies under both factors (b) and (c),[27] thereby increasing the likelihood that the jury would find that the aggravating circumstances outweighed the mitigating and would therefore return a death sentence.

It is settled that factors (b) and (c) of section 190.3 pertain only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106; see also *People* v. *Melton, supra,* 44 Cal.3d at p. 764.) We have also determined, however, that section 190.3 contemplates the dual consideration of a prior felony conviction under factors (b) and (c) when the underlying felony involved violence. (*People* v. *Melton, supra,* at pp. 765-766; cf. *People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480] [explaining the difference between factors (b) and (c)].) This is because factors (b) and (c) are directed to distinct aspects of the defendant's character: his propensity to violence and his failure to respond to correction. To consider each in aggravation does not artificially inflate the aggravating factors, but, rather, truly reflects the defendant's "particularized circumstances" (*Jurek* v. *Texas* (1976) 428 U.S. 262, 274 [49 L.Ed.2d 929, 939, 96 S.Ct. 2950]). (See *People* v. *Melton, supra,* 44 Cal.3d at pp. 765-766.) It cannot seriously be disputed that a defendant whose prior conviction involved violence is more culpable than one whose did not, nor that a defendant whose prior violent activity resulted in conviction is more culpable than one who has not previously been punished by the criminal justice system.

In the case at bench, in any event, there could have been no confusion concerning the application of the three factors. The prosecutor in closing argument explained that the "circumstances of the crime" referred to the nature of the attack on Leah Schendel, "any prior felony convictions" referred to defendant's two convictions for armed robbery, and "other violent criminal conduct" by defendant referred to the attack on Mavis W. and defendant's other specified assaultive behavior. Defense counsel covered the same ground.

---

[27] CALJIC No. 8.84.1 essentially tracks section 190.3. Factors (a), (b) and (c) of section 190.3 provide in pertinent part that the trier of fact shall consider: "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding . . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction."

I. *Mental State Instructions.*

 Defendant argues that the trial court's instructions relating to mental disturbance improperly limited consideration of his mental condition in violation of the principle that the jury must be permitted to give weight to all aspects of a defendant's character and record and the circumstances of the offense. (See *Lockett* v. *Ohio, supra,* 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990]; *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 110 [71 L.Ed.2d 1, 8].)

Pursuant to factors (d) and (h) of CALJIC No. 8.84.1, the jury was instructed to consider in determining penalty "(d) whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" and "(h) whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." Defendant maintains that factor (d), by requiring an "extreme" condition, impermissibly excludes consideration of a lesser mental disturbance. He further maintains that the similarity between factor (h) and the test for legal insanity[28] would mislead the jury, which at the sanity phase of trial had found defendant sane, to believe that it could not consider defendant's mental disease or defect in mitigation.

In *People* v. *Ghent, supra,* 43 Cal.3d at page 776, we rejected the contention that the provision of the 1977 death penalty law which referred to "extreme" mental or emotional disturbance deprived the defendant of his right to have the jury consider all his mitigating evidence, in light of the further "catchall" provision of the statute, which directed the jury to consider "any other circumstance which extenuates the gravity of the crime" (former § 190.3, factor (j); see now § 190.3, factor (k)). We determined that under the latter instruction the jury could take into account a mental condition of the defendant "which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (43 Cal.3d at p. 776.) The same is true under the 1978 law. In the instant case, no argument was made that defendant's mental or emotional disturbance could be considered only if "extreme," the prosecutor recognized that defendant had "mental problems," and defense counsel expressly argued that defendant was "under duress or emotional disturbance."

Nor do we agree with defendant that factor (h) suggested to the jury that, having found defendant sane, it could not consider his asserted mental

---

[28] CALJIC No. 4.00 defines legal insanity as follows: "A person is legally insane if, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

defects or disease in mitigation. Whereas the insanity instruction requires that a defendant lack "substantial capacity" to appreciate the criminality of his conduct or to conform his conduct to the law, factor (h) requires only that his capacity to do so be "impaired." The difference between the two standards is readily apparent. Further, both the prosecutor and defense counsel informed the jury that defendant's mental condition could properly be considered even though the jury had found him to be legally sane.[29] Moreover, in response to an inquiry from the jury during deliberations as to whether instruction (i)—the age of defendant at the time of the crime— referred to chronological age or state of mental development, the court instructed the jury that "state of mental development is provided for under (h) and/or (k)."

On the record before us there is nothing to suggest that the jury failed to give full consideration to defendant's evidence of his mental or emotional state at the time of the offense.

J. *Exclusion of Mental Evidence.*

 Defendant maintains that independent of its impact on the guilt and sanity phases, exclusion of certain of his mental-state evidence, discussed *ante*, requires reversal of his penalty verdict in that it removed from the jury's consideration factors in mitigation under factors (d), (h), and (k) of CALJIC No. 8.84.1. As indicated, however, exclusion of the cited evidence at the guilt and sanity phases was not error. Defendant did not seek to introduce the evidence at the penalty phase. Moreover, much of the cited evidence—that defendant suffered a head injury in Vietnam, that he received a head injury when he was 12 years old, that he was upset by symbols of Vietnam, and that his behavior changed for the worse on his return from Vietnam—was before the jury in any event, as was abundant other evidence relative to defendant's asserted mental illness.

---

[29] The prosecutor stated: "Another factor which you may consider and may be called upon by [defense counsel] to consider [is] the existence of mental disorders, mental problems on the part of Manuel Babbitt. And certainly you have been bombarded with a lot of information which you might consider, even in spite of the fact that your collective judgment [was] that he was sane at the time of the crime, you might want to consider or take into account what, for lack of a better word, might be his mental problems in deciding what the appropriate punishment should be." Defense counsel argued at length that defendant had a mental impairment, that he was sick, and that the jury could consider his mental illness even though it had determined that such illness was insufficient to constitute a legal defense to the crime.

### K. *Motion to Reduce Penalty.*

Defendant alleges that the trial court's denial of his section 190.4, subdivision (e) motion to reduce the penalty[30] was erroneously based on a misunderstanding of the applicable aggravating and mitigating factors, requiring that the penalty judgment be vacated.

Defendant first cites the court's consideration of his two robbery felony convictions under both factors (b) and (c) of section 190.3 (see fn. 27, *ante*). As previously indicated, however, when a defendant's prior felony convictions involve violent criminal activity, the convictions may properly be considered under both factors (b) and (c). (*People* v. *Melton, supra,* 44 Cal.3d at pp. 765-766.)

■ Defendant next asserts that the court incorrectly assessed his mental state evidence under factors (d) ("extreme" mental or emotional disturbance) and (h) ("impaired" capacity). The record shows, however, that in weighing and considering the expert testimony, the court rejected the evidence of defendant's mental problems and accepted as the more credible the testimony of Dr. Coleman that defendant did not suffer from emotional or mental disturbance and that of Dr. Galioni that he did not have impaired mental capacity.[31] In light of its assessment of the evidence, the court did not err in failing to consider defendant's mental state as a mitigating factor.

Defendant asserts additionally that as to factor (h) the court erroneously found his lack of impaired capacity to be a factor in aggravation.[32] Viewed

---

[30] Section 190.4, subdivision (e) provides in pertinent part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

[31] The court stated: "[T]he more credible testimony was the testimony specifically by Dr. Coleman to the effect that you can simply look at what the defendant did and how he did it in making your determination as to his mental capacity or mental deficiency [reciting defendant's breaking into an apartment having "easy access," as opposed to apparently other locked doors, forcibly overcoming the victim, achieving some of his purposes and leaving, giving exculpating explanations as to how he came into possession of money and trying to get his nephew to dispose of some of the "loot"]. [¶] [Further,] the Court finds that the testimony by Dr. Galioni to be the much more credible testimony when he concluded that the defendant has a passive aggressive personality disorder, which means that he might become angry and lash out at others verbally or physically, but that that does not excuse him legally from the consequences of his own behavior."

[32] The court stated: "So certainly at least as to factor (h) which speaks about impairment as a result of mental disease, defect and so forth, the Court finds that the defendant's capacity

in context, the court's comment appears to be a reference to the fact that defendant's conduct was "purposeful, and . . . was goal oriented," which fact the court had found negated any impairment. (See fn. 31, *ante*.) The purposeful nature of defendant's conduct could properly be viewed as an aggravating circumstance of the offense under factor (a). In any event, the error, if any, could not have affected the court's ruling in light of the court's determination that there were numerous other proper factors in aggravation and no real mitigating factors and the further fact that the court did not engage in a mechanical counting of factors.

 Defendant contends that the court erroneously considered his age as an aggravating factor. The record shows that the court determined that defendant's age could not "operate as a mitigating factor, especially when viewed against [his] prior exposure to the criminal process. . . . [T]he defendant is indeed old enough to have learned from his past behavior and mistakes . . . ." The court concluded that the defendant's age "certainly . . . produces no mitigation. If anything, it produces further aggravation . . . ." The court's consideration of defendant's age was not error. (*People v. Lucky, supra,* 45 Cal.3d at p. 302.)

 Finally, defendant argues that the court erroneously failed to treat his combat duty in Vietnam and its impact on him as mitigating factors under factors (d), (h) or (k) of section 190.3. Defendant asserts that his combat service in Vietnam is "per se a mitigating circumstance," and that while the trial court could have found that it was outweighed by aggravating factors, the court was not free to determine that the experience was not a mitigating circumstance. Defendant cites the commendations and medals he received, as well as the brutal nature of his combat duty and the devastating effect it had on him, as matters that were not seriously in dispute and that were necessarily of mitigating effect.

Defendant's premise that the court failed to consider the mitigating effect of his combat service is faulty. Although the court stated that "to the extent that the label of post-Vietnam stress syndrome or any other label may be applicable to the defendant within the field of psychiatry, . . . that condition simply does not extenuate the gravity of the crime, so the Court finds no mitigation under this factor [(k)]," and that it found that there are no "real mitigating factors," it further stated that it had given consideration to the matters testified to by defendant's family (defendant's attributes and the post-Vietnam changes in him) and to defendant's expressions suggestive of remorse, "[b]ut to the extent that those may be factors in mitigation, and to

---

was not so impaired as to excuse his conduct, and the Court specifically further finds that to be a factor in aggravation."

the extent that they exist, there are in opposition to those factors many, many aggravating circumstances . . . ." The court thus concluded that the aggravating circumstances outweighed the mitigating circumstances and "that the jury's verdict is supported certainly beyond any reasonable doubt."

The trial court's charge under section 190.4, subdivision (e) is independently to review the evidence and, guided by the factors set forth in section 190.3, to determine "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." In the instant case, in light of the numerous aggravating factors properly cited by the court—the merciless beating and sexual assault of a "very frail" 78-year-old woman who had "the sanctity and privacy of her home violated" and her "physical person and her physical surroundings . . . totally violated and destroyed, including her dignity as a human being," the multiple special circumstances that the homicide occurred during the commission of three specified felonies, the brutal attack on Mavis W. who evidently was spared death only by the "happenstance of someone . . . interrupting the attack," defendant's history of violent behavior, his prior felony convictions, and the court's determination of no mitigating factors—it is inconceivable that the trial court, absent the asserted errors, would have ruled differently on defendant's application for modification of the verdict of death. Any error, therefore, was nonprejudicial. (Cf. *People v. Williams* (1988) 44 Cal.3d 883, 971-972 [245 Cal.Rptr. 336, 751 P.2d 395] [1977 law]; *People v. Ruiz, supra,* 44 Cal.3d at pp. 624-625 [no indication court misapplied proper review standard].)

### L. *Victim Impact Statement.*

After denial of the verdict modification application, the court, pursuant to section 1191.1,[33] considered the victims, views concerning the crimes and defendant before imposing judgment. Relying on the recent decision of the United States Supreme Court in *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], defendant argues that the court's consideration of the victims' views requires that the penalty judgment be vacated and remanded for reconsideration of the verdict-modification application.

---

[33] Section 1191.1 provides in pertinent part that "[t]he victim . . . or next of kin has the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his or her views concerning the crime, the person responsible, and the need for restitution. The court in imposing sentence shall consider the statements of victims . . . and next of kin made pursuant to this section and shall state on the record its conclusion concerning whether the person would pose a threat to public safety if granted probation."

In *Booth, supra,* the high court held that the admission of a "victim impact statement" in a capital sentencing procedure violates the Eighth Amendment to the United States Constitution in that it focuses attention on a factor not generally known to the defendant and hence not relevant to his or her blameworthiness. In the instant case the trial court considered the victims' statements only after it ruled on the modification application and only in connection with the sentences to be imposed on defendant's noncapital offenses. In this context consideration of the victims' statements was not error.

M. *Constitutionality of Statute.*

Defendant asserts that the 1978 statute is unconstitutional under the due process and the cruel and/or unusual punishment clauses of the California and the federal Constitutions (Cal. Const., art. I, §§ 7, subd. (a), 15, 17; U.S. Const., Amends. VIII, XIV) because it does not require as a prerequisite to imposition of the death penalty that the jury find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that death is the appropriate penalty. We rejected essentially identical constitutional challenges in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779. For the reasons stated therein we conclude the statute is not unconstitutional on the asserted grounds. (See *People* v. *Allen, supra,* 42 Cal.3d at p. 1285.)

N. *Proportionality Review.*

Defendant requests this court to undertake a comparative sentence review (also denoted an "intercase proportionality review") to determine whether under the California Constitution his death sentence is disproportionate to the penalty imposed on other persons who have committed similar offenses. Defendant acknowledges that comparative review is not required by the federal Constitution. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41, 104 S.Ct. 871].) He asserts, however, that the due process and equal protection clauses and the prohibition against cruel or unusual punishment of the California Constitution (art. I, §§ 7, 15, 17) authorize and require such review. Further, he maintains that insofar as comparative sentence review is provided to noncapital felons under section 1170, subdivision (f), equal protection requires that it also be afforded capital defendants.

We have consistently declined to undertake intercase proportionality review. (*People* v. *Howard, supra,* 44 Cal.3d 375, 445 [1978 law]; see also *People* v. *Allen, supra,* 42 Cal.3d at p. 1285 [1978 statute not unconstitutional for failure to require intercase proportionality review]; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779 [same].) In *Pulley* v. *Harris, supra,* 465

U.S. at pages 51-54 [79 L.Ed.2d at pp. 41-43], the United States Supreme Court determined that our death penalty statute is valid notwithstanding the lack of such proportionality review. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 778.)

Defendant's claim that equal protection requires that we afford capital defendants the comparative sentence review that is provided noncapital defendants by section 1170, subdivision (f),[34] was rejected in *People* v. *Allen, supra,* 42 Cal.3d at pages 1286-1288 (plur. opn.). (See also *People* v. *Melton, supra,* 44 Cal.3d 772.) For the reasons stated therein, we adhere to that determination.

Insofar as defendant seeks to assert that his death sentence is disproportionate to his individual culpability within the meaning of *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] and *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], he has failed to offer any analysis of the facts to support this claim and our reading of the record does not support it. (Cf. *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676] [Eighth Amendment does not prohibit death penalty for a defendant whose "participation is major and whose mental state is one of reckless indifference to the value of human life"].)

## VI. CONCLUSION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

Lucas, C. J., Mosk, J., Broussard, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied August 25, 1988, and the opinion was modified to read as printed above.

---

[34] Section 1170, subdivision (f) requires the Board of Prison Terms, within one year after the defendant commences his term of imprisonment, to determine "whether the sentence is disparate in comparison with the sentences imposed in similar cases." If the board determines that the sentence is disparate, the section provides for notice to the sentencing court, hearing and resentencing.