Filed 9/14/20  P. v. Molina CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

ANDREW STEVE MOLINA,

    Defendant and Appellant.

E072457

(Super.Ct.No. RIF1603166)

OPINION

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Andrew Steve Molina appeals following his convictions for the first degree murder of Anthony Razo (the victim) (Pen. Code,[1] § 187, subd. (a), count 1), who was shot to death in the driveway of his home in the early morning hours of June 26, 2016, and being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 2). Defendant contends: (1) the trial court abused its discretion in excluding third party exculpatory evidence; and (2) his sentence for being a felon in possession of a firearm must be stayed under section 654. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *The Prosecution's Case.*

In June 2016, the victim lived on Stover Street in Riverside. He used the backyard shack to drink beer and smoke methamphetamine with his friends. His friends included Alex Arzate and defendant. Defendant's cousin,[2] Jacob Gamboa, lived with Jessica Valdivia in a house nearby. Gamboa and the victim did not get along; however, they were "keeping the peace" for defendant's sake. The victim and Arzate were associated with the La Sierra Brown Knights gang; defendant was a member of the Hillside gang; and Gamboa was a former member of the 5150 gang, a rival of the La Sierra Brown Knights.

During the afternoon of June 25, 2016, Arzate encountered Valdivia, a former schoolmate, while waiting for the victim to purchase beer and return to the car. Arzate

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant represented that he and Gamboa were cousins; however, they are not actually related.

2

did not know Valdivia was dating Gamboa. When he talked to her, she "wasn't really talking." The victim returned, saw Valdivia, and told Arzate, "Forget this girl, fool. Let's go." Arzate threw his "hands up" and said, "La Sierra up in this motherfucker." Although Arzate meant the comment to be a joke, Valdivia interpreted it as an act of disrespect.

Later in the day, Gamboa went to the victim's home and yelled, "You guys banging on my lady?" and "That's disrespect. If you want to bang, bang on me." Arzate said, "[I]t wasn't like that," apologized, and offered to fight Gamboa one-on-one and apologize to Valdivia. The victim supported Arzate, saying, "My homie didn't bang on your lady like that." In response, Gamboa pulled out a handgun and began "talking shit." While the victim yelled back, Arzate pushed him toward the backyard. Gamboa left, but returned, driving by the victim's house "real slow." The victim returned to the front yard holding a shotgun.

The victim, Arzate, and others continued to party at the victim's home into the evening. In the early morning hours of June 26, 2016, defendant arrived and spoke with the victim and Arzate. Defendant said he was there to help resolve their conflict with Gamboa and not to take sides. Arzate conveyed what happened, explaining he meant no disrespect to Valdivia, and he proposed a one-on-one fight with Gamboa, followed by an apology to Valdivia. Defendant left.

When defendant was leaving, Arzate saw him walking away with another person, who Arzate assumed was Gamboa. A short while later, while Arzate was inside the house, he saw defendant and Gamboa approach. Gamboa was holding a handgun, and

defendant was carrying a shotgun. Arzate testified he saw both of their faces clearly and recognized both people. He also recognized defendant based on his clothing. Arzate ran outside and warned the victim, who was standing by the side gate holding a shotgun. Arzate told the victim, "Fucking Sonic and Maniac are in the front yard, fool."[3] At the victim's request, Arzate ran toward the backyard to get help and, on his way, he heard gunshots.

### B. The Defense Case.

Defendant's younger brother and a family friend both testified that on June 25, 2016, defendant was home attending a "going-away party" the entire night, except from 10:00 p.m. to midnight. The party ended around 2:00 a.m., and defendant's car was parked in front of the house at the time.

Defendant testified that he was very good friends with both the victim and Gamboa. During the afternoon of June 25, 2016, the victim told defendant that Gamboa had disrespected the victim at his home. Defendant called Gamboa who was also agitated. That evening, defendant left the "going-away party" at his home to talk to Gamboa, who was at a mutual friend's house. When Gamboa and Valdivia left the friend's house, defendant followed in his car. At Valdivia's house, defendant saw Gamboa's cousin, Victor Gastelum, in the driveway. Defendant did not particularly like Gastelum, so he did not go inside Valdivia's house. As he was leaving, defendant had a "bad feeling" and decided to stop at the victim's house and talk to the victim.

---

[3] Gamboa's gang moniker is "Maniac," and defendant's is "Sonic."

4

Defendant parked his car away from the victim's house because he did not want his car, which appeared stolen, to draw attention to the house given the illegal activities happening in the backyard. As he approached the house, defendant saw a group of people across the street. He went to the backyard and talked to the victim and Arzate. The victim was still upset and showed defendant a shotgun. Defendant attempted to diffuse the situation; however, the victim remained angry and was convinced the conflict could not be resolved. Defendant left, thinking he was walking alone, but he was not paying close attention, and the unfamiliar group of people was still across the street. He returned home around midnight and went to bed.

On June 26, 2016, defendant woke up around 9:00 a.m., went to a friend's house, and drank heavily. As he attempted to drive home, he passed out and was arrested for driving under the influence (DUI) and booked into county jail. Upon his release, defendant went home and slept until June 27. When he woke up, he immediately left for Mexico because he had multiple DUI convictions and did not want to go back to prison. He was ignorant of the victim's death until a friend informed him that he and Gamboa had been charged with murder. Defendant did not return to the United States because he was worried that his hasty relocation "made [him] look really bad." Since he knew he was innocent, he assumed the police would eventually find and charge the actual killer and then drop the charges against him. In October 2016, defendant was extradited to the United States and taken into custody.

## C. The Verdict and Sentencing.

On March 21, 2019, a jury convicted defendant of first degree murder and of being a felon in possession of a firearm. The jury also found true the allegation that he personally and intentionally discharged a firearm during the commission of the murder, causing great bodily injury or death. (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8).) In a bifurcated proceeding, the trial court found that defendant's 2013 conviction for spousal abuse (§ 273.5, subd. (a)) qualified as a prison prior (§ 667.5, subd. (b)). Defendant was sentenced to state prison for two years, plus 50 years to life.

## II. DISCUSSION

### A. Exclusion of Third Party Culpability Evidence.

Defendant contends the trial court abused its discretion in excluding evidence regarding the culpability of another party: Victor Gastelum. We disagree.

#### 1. Further background information.

##### a. The first request to introduce evidence regarding Gastelum.

Everyone agreed Gamboa was one of the two perpetrators; however, his case was bifurcated from defendant's. Prior to trial, defense counsel sought to admit evidence that Gastelum was the other perpetrator in the victim's murder. According to defense counsel, on June 25, 2016, "roughly 24 hours" before the victim's murder, Gamboa and Gastelum committed another murder at a USA gas station. Thus, Gamboa was charged with two murders: (1) the gas station murder (with Gastelum as his codefendant), and (2) the victim's murder (with defendant as his codefendant). At the time of defendant's trial, Gastelum had been convicted in the gas station murder, but Gamboa had yet to be

6

tried in both the gas station murder and the victim's murder cases; Gamboa faced the death penalty. Defense counsel wanted to introduce evidence of the gas station murder to argue Gastelum, not defendant, was with Gamboa when the victim was murdered.

The prosecution sought to exclude the evidence pursuant to Evidence Code section 352. The prosecutor maintained: (1) there was no direct or circumstantial evidence linking Gastelum to the victim's murder, i.e., Gastelum had no motive to kill the victim, and none of the witnesses identified him as one of the perpetrators; and (2) evidence of the gas station murder would confuse the jury. Without identifying the evidence, defense counsel argued that "evidence will be produced . . . during the course of this trial that will show that there is a connection between Mr. Gastelum and the [victim's] murder." The trial court tentatively excluded the evidence, but agreed to revisit the issue.

b. The second request to introduce evidence regarding Gastelum.

The prosecution's star witness was Arzate. Prior to trial, law enforcement officers interviewed him at least three times. At the scene of the crime, Arzate told a detective he had seen two men running away from the house after the shooting, but he did not identify either person or disclose the incidents earlier in the day. Three days later, Detectives Wheeler and Tillett conducted a surprise interview of Arzate at the probation office. Arzate told the detectives essentially the same story he later testified to at trial; however, his identification of defendant was weaker and equivocal. Expressing concern for his safety and that of his family, Arzate indicated he did not want to "do the rat thing." Around this same time, Arzate told the victim's family that defendant and Gamboa were

7

the shooters, but he did not want to identify them to the police.[4] About one week after the murder, during another interview, Arzate told Detective Wheeler he did not want to be a "snitch" and would not agree to testify in court. Arzate denied seeing Gastelum on the night of the murder or for a long time. Although he added that he could be mistaken about seeing defendant, Arzate stated: "I know [defendant] was in the backyard when he left 'cause I talked to him. Everybody else there saw him. So he left, no one really saw him come back though. [¶] . . . [¶] But I seen someone come back that fucking dressed . . . [¶] . . . [the same] way that [defendant] was."

After the direct examination of Arzate, defense counsel raised the third party culpability issue again because counsel wanted to cross-examine Arzate about his possible mistaken identification of defendant. The prosecutor asserted Arzate's statements were not true ambiguities or uncertainties, but equivocations on his identification of defendant—because Arzate did not want to be a "rat"—and, thus, subject to cross-examination only. The trial court reviewed the relevant portion of Arzate's interview and ruled the evidence about Gastelum was inadmissible. Defense counsel added that if defendant testified, he would say he saw Gastelum with a shotgun "sometime either before or after . . . the USA [gas station] shooting." The court maintained its ruling. On cross-examination, Arzate stated, "I'm sure it was [defendant]."

---

[4] At Detective Wheeler's request, the victim's mother recorded Arzate telling her that defendant and Gamboa were the shooters; the recording was not admitted into evidence.

c.     The third request to introduce evidence regarding Gastelum.

Immediately before defendant was scheduled to testify, defense counsel again sought to introduce evidence that Gastelum was culpable for the victim's murder. After reviewing the standard governing admissibility, the trial court noted there was no evidence Gastelum had a motive to kill the victim, and there was no direct or circumstantial evidence linking Gastelum to the victim's murder.

In response, defense counsel stated: (1) Gastelum was living with Gamboa; (2) Gastelum and Gamboa were members of the 5150 gang, which hated the La Sierra Brown Knights gang (the victim's gang); (3) Gastelum had committed the gas station murder with Gamboa, which involved "disrespect"; and (4) the victim's murder also involved "disrespect."[5] He added: "I don't think it's a reach to say that Mr. Gastelum backed up Mr. Gamboa in the shooting of [the victim]."

The court reaffirmed its prior ruling prohibiting evidence of the gas station murder, finding insufficient evidence to link Gastelum to the victim's murder, but it reiterated defense counsel's right to argue the ambiguities in Arzate's testimony.

### 2.     *Applicable legal principles*

"[C]ourts should . . . treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)."

---

**5** At this point in the trial, the testimony had not established that Gamboa was living at Valdivia's house; defendant later testified that they were living together, and he had seen Gastelum at their house when defendant followed Gamboa and Valdivia home.

9

(*People v. Hall* (1986) 41 Cal.3d 826, 834 (*Hall*).) To be relevant and admissible, however, "evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.) "At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*Hall*, at p. 833.) Rather, "[u]nder *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.'" (*People v. DePriest* (2007) 42 Cal.4th 1, 43.) "Without this link, such evidence is irrelevant and cannot be admitted." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 283.) Thus, "[e]vidence that another person had 'motive or opportunity' to commit the charged crime, or had some 'remote' connection to the victim or crime scene, is not sufficient to" establish the required link. (*DePriest*, at p. 43.)

"We review a trial court's ruling on the admissibility of third party culpability evidence for abuse of discretion." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 572.)

### 3. *Analysis.*

Since Arzate's identification of the second shooter was equivocal, defendant contends the trial court erred in excluding evidence that would show Gastelum committed the victim's murder with Gamboa. Defendant contends the evidence was relevant

10

because: (1) Gastelum committed the gas station murder with Gamboa roughly 24 hours prior to the victim's murder; (2) the motive for both murders was to avenge an act of disrespect; and (3) defendant saw Gastelum with a shotgun prior to the gas station murder. However, there was no direct evidence linking Gastelum to the victim's murder.

Arzate's equivocal identification of the second shooter suggested he was intentionally creating ambiguity because he was trying to avoid being labeled a "snitch." Arzate knew Gastelum and confirmed that he did not see Gastelum at the victim's house on June 26, 2016. Although Arzate speculated the second shooter could have been Gastelum, Arzate stated in his interviews and at trial that he spoke to defendant in the victim's backyard prior to the shooting, and the second shooter was wearing the same clothing that defendant had been wearing during that earlier conversation in the backyard the same day. Thus, while Arzate was "pretty fucking sure" but not "1000%" sure of the identity of the second shooter, the trial court did not abuse its discretion in finding it was insufficient to link Gastelum to the victim's murder.

The additional facts that Gastelum and Gamboa were in the same gang and had committed the gas station murder to avenge an act of "disrespect" do not change our analysis. As the People point out, in a gang-related context, the fact a crime is committed in response to a perceived act of disrespect is "hardly uncommon." To treat Gastelum's gang membership as a motive to murder the victim is highly speculative in the absence of other evidence. Here, defendant offered no evidence of any connection, let alone hostility, between the victim and Gastelum, other than the conjecture that Gastelum must have been involved with Gamboa in the victim's murder because the two fellow gang

11

members were involved in the gas station murder. However, Gastelum's involvement with Gamboa in the gas station murder had little, if any, probative value, since the evidence shows the victim's murder was a result of the personal animosity between the victim and Gamboa, coupled with the victim's defense of Arzate's actions involving Valdivia.

Moreover, we reject defendant's assertion that the trial court's isolation of Arzate's testimony ("I'm sure it was [defendant]") amounted to a credibility determination that invaded the province of the jury. The trial court relied on defendant's testimony to assess the direct evidence presented to the jury, not the third party culpability evidence. (*People v. Lewis* (2001) 26 Cal.4th 334, 373 ["[T]he trial court's determination that the evidence presented only speculative issues did not invade the jury's province."].) Defense counsel cross-examined Arzate on his prior statements, and any equivocality was brought to the jury's attention, along with Arzate's motive (safety concerns and not wanting to be a snitch) for being equivocal in his identification of the second shooter. However, given Arzate's unequivocal trial testimony ("I'm sure it was [defendant]"), introducing Gastelum and his involvement in the gas station murder was too attenuated and speculative to be admissible under the third party culpability theory. (*Hall*, *supra*, 41 Cal.3d at p. 834; see *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [Evidence is irrelevant if it produces only speculative inferences.].) We, therefore, find no abuse of discretion in the exclusion of this evidence.

"Having concluded this speculative third party culpability evidence was properly excluded, we also reject defendant's claim that his constitutional rights were violated by the exclusion." (*People v. Young* (2019) 7 Cal.5th 905, 938.)

B.      *Application of Section 654.*

Defendant contends his sentence for being a felon in possession of a firearm must be stayed under section 654 because there is no substantial evidence he possessed the firearm "distinctly antecedent and separate from the murder." We disagree.

Section 654 precludes multiple punishments not only for a single act but also for an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) "'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.' [Citation.] The court's express or implied findings in support of its determination that section 654 does not apply will be upheld on appeal if substantial evidence supports them." (*People v. Cruz* (2020) 46 Cal.App.5th 715, 737.)

Section 29800, subdivision (a)(1), forbids convicted felons from possessing any firearm. Additional punishment for possessing a firearm is warranted if defendant purposefully possessed the shotgun before the murder took place. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143-1145 [Where a defendant "arrive[s] at the scene of his . . . primary crime already in possession of [a] firearm," that possession is "distinctly

13

antecedent and separate from the [ensuing] . . . crimes," and section 654 does not bar multiple punishments.].)  Here, substantial evidence supports the trial court's determination that defendant was in possession of the shotgun before he arrived at the crime scene.  The record shows defendant was unarmed when he was at the victim's home before the murder.  Arzate saw him leave with another person, who Arzate assumed was Gamboa.  Shortly thereafter, Arzate saw them return carrying firearms; Gamboa was carrying a handgun, and defendant was carrying a shotgun.  Since there is no evidence to suggest someone handed defendant the shotgun at the scene, or that he happened upon a loaded shotgun on the street, the reasonable inference is he purposefully possessed the gun before he arrived at the victim's house.  Accordingly, at this point, defendant's violation of section 29800, subdivision (a)(1), was complete; his possession of the firearm was "not merely simultaneous with the [murder], but continued before, during and after" the crime.  (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413.)

Because there is substantial evidence that defendant possessed the shotgun prior to the victim's murder, the trial court's imposition of a separate punishment on the felon in possession of a firearm offense does not violate section 654.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER_____
Acting P. J.

We concur:


RAMIREZ_____
P. J.


FIELDS_____
J.

15